THIOKOL CHEMICAL CORPORATION, A CORPORATION, ETC., PLAINTIFF-RESPONDENT, v. MORRIS COUNTY BOARD OF TAXATION, TOWNSHIP OF DENVILLE, *ET AL.*, DEFENDANTS-APPELLANTS.

UNITED STATES OF AMERICA, INTERVENOR PLAINTIFF-RESPONDENT.

Argued November 4 and 6, 1963—Decided January 20, 1964.

406

Mr. *Alan B. Handler,* Deputy Attorney General of New Jersey, argued the cause for defendant-appellant Morris County Board of Taxation (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney).

Mr. *Warren E. Dunn* argued the cause for defendants-appellants Township of Denville and J. Elmer Vanderhoof, Tax Collector, etc. (*Messrs. Dunn & Ambrose,* attorneys).

Mr. *Marshall Crowley* argued the cause for plaintiff-respondent Thiokol Chemical Corporation (*Messrs. Toner, Crowley, Woelper & Vanderbilt,* attorneys).

Mr. *George F. Lynch,* of the District of Columbia Bar, argued the cause for intervenor plaintiff-respondent United States of America (*Mr. David M. Satz, Jr.,* United States Attorney and *Mr. Robert W. Carroll,* Assistant United States Attorney; *Mr. Louis F. Oberdorfer,* Assistant Attorney General, *Mr. Lee A. Jackson, Mr. I. Henry Kutz,* of the District of Columbia Bar, attorneys).

The opinion of the court was delivered by

FRANCIS, J. This appeal involves the validity of assessments imposed under the Leasehold Taxing Act, *L.* 1949, *c.* 177, *N. J. S. A.* 54:4–2.3 *et seq.,* by the Township of Denville on plaintiff, Thiokol Chemical Corporation, and on Reaction

Motors, Inc. which had merged into Thiokol. The Superior Court, Law Division, vacated the assessments, 76 *N. J. Super.* 232 (*Law Div.* 1962), and review of the judgments was sought in the Appellate Division. We certified the appeal on our own motion before it was argued there.

In the tax years involved in this litigation, the United States owned certain land and buildings and equipment therein located on Ford Road, Township of Denville, Morris County, New Jersey. In 1957 and until May 1, 1958 Reaction Motors, Inc. (Reaction), a New Jersey corporation, used the buildings and equipment in the performance of contracts with the Department of the Navy. On May 1, 1958 Reaction merged into plaintiff Thiokol Chemical Corporation (Thiokol), a Delaware corporation which succeeded to and continued the operation under the Navy contracts. On July 30, 1958 Thiokol and the United States (more particularly, the Department of the Navy) executed new agreements in essentially the same terms and for the same type defense work. Since that time Thiokol has used the buildings and equipment in the fulfillment of its government contracts.

Reaction was an engineering and research company in the field of liquid propellants, high pressure gas generators, rocket engines and other military end-use devices employing practical applications of special fuel combustion and reaction principles. Prior to 1946 it had been conducting various development programs in the field for the Armed Services. In 1946 it moved into the Navy Air Rocket Test Station at Lake Denmark, New Jersey in order to meet expanding demands of the Navy for its services. Prior to 1946 the annual volume of its business was less than $1,000,000. By the end of 1951 the volume had increased to $4,637,000. In 1949 Reaction moved the administrative and manufacturing operation a few miles away to a plant at Rockaway, New Jersey. The engineering and research divisions were left at the Navy Test Station by agreement with the Navy. These divisions continued to operate in makeshift fashion in five separated buildings which had served formerly as Marine barracks. In 1952

the program had expanded to such an extent that the facilities were deemed inadequate to cope with the Navy requirements. At this time Reaction had no private commercial contracts.

In April 1952, after discussion with representatives of the Navy, Reaction formally requested the government to provide new facilities, buildings and equipment off, but in reasonable proximity to, the Navy Station which would permit integration of its manufacturing and research and development activities. The request contemplated removal of all operations from the Station except the test facilities which would remain there following considerable enlargement of the structures used in connection with testing. After investigation, the Navy Department found the existing facilities inadequate to handle its projected program and agreed to provide the necessary land, buildings, laboratories and shops, as well as machine tools and equipment, at a total estimated cost of $3,195,000 for the use of Reaction in the performance of the government contracts.

Thereafter, pursuant to a contract entered into on November 21, 1952 between the United States and Reaction, the government acquired by condemnation a 52.70 acre parcel of land in Denville Township. (11.07 acres thereof were sold to Thiokol on which, at its own expense, an administration building was constructed. Thiokol has always paid taxes on this property. It is not involved in the present proceeding.) On the remaining 41+ acres the buildings and structures which gave rise to the assessments under attack were constructed wholly at the expense of the United States. Machine equipment and tools were transferred from the old buildings on the Naval Test Station. They and some newly-acquired equipment and tools were installed in the new plant. The purchases and installation were at government expense. Ownership of the land, plant and equipment was in the United States and remained so throughout the 1957 and 1958 tax years. In furtherance of the Navy program and pursuant to the contract, the government also constructed certain build-

ings and additions and furnished equipment at the test sites on the Naval Air Rocket Test Station at Lake Denmark. Upon completion of the plant on Ford Road in Denville Township and the additional test facilities at the Test Station, they were made available for Reaction's use in the performance of its Navy contracts. Thereafter, including the tax years in question, these government-owned facilities were used by Reaction, and, following the merger, by Thiokol, exclusively in the performance of Department of Defense contracts or orders, or of subcontracts for private corporations which were prime contractors with the United States. More particularly, in 1957 and 1958 respectively, 99.2% and 99.7% of the work (expressed in percentage of sales) was performed by Reaction and Thiokol as prime contractors with the United States. The remaining .8% and .3% arose from subcontracts with other government prime contractors.

The nature of the relationship between the United States and Reaction with respect to the use of the government-owned plant and facilities in Denville is at the root of the problem in the matter before us. Consequently, some particularization of the November 1952 contract is required. On July 30, 1958, after the Reaction-Thiokol merger, a new agreement between the United States and Thiokol was made covering the same subject. Its essence is substantially the same as the earlier one and does not require any separate treatment for present purposes.

The contract does not employ such words as "rental" or "lease" of the premises to Reaction. It speaks solely in terms of use of the facilities and of permission to use them. The stipulation is that "no charge will be made by the Government for the use of the Facilities" providing Reaction uses them exclusively for the performance of contracts or orders for the government or its suppliers. Departure from the exclusive use was entirely in the control of the Navy representative. Authorization for some private business could be granted or withheld by him. If granted, Reaction would be required to pay to the government a use charge in an amount

to be agreed upon. In addition, the authorization would be subject to instructions regarding priority of the Armed Services contracts. As has been indicated, neither Reaction nor Thiokol engaged in any nongovernment work during the life of the use contract.

Moreover, under the agreement, Reaction could not acquire, install, relocate or rehabilitate any equipment in the plant without written approval of the Naval Inspector to be given only after he decided that such activity would carry out the purposes of the facilities program. Purchase of equipment from an outside source was prohibited if a similar item was known by the contractor to be available from the government reserves. Nonseverable equipment, as defined in the Armed Services Procurement Regulations, could not be installed in the plant, nor could the contractor, without consent of the Naval Inspector, substitute items of equipment for those specified in the agreement.

The agreement obliged Reaction to protect, maintain and repair the facilities "in accordance with the requirements of their function as a part of the Naval Industrial Reserve, and as the Government may from time to time require and direct." However, if the Bureau of Aeronautics decided that items of equipment were obsolete or no longer useful in performing the government work, the duty to maintain ceased although with the written consent of the Naval Inspector, they could be adapted by the contractor to current needs.

Reaction agreed further that representatives of the government would have the right of inspection of the plant, equipment, work in progress and all records pertaining to use of the facilities and contract performance. In this connection the testimony reveals that the government maintained a "fully staffed" office of about 10 persons on the premises to look after its interests in the products and equipment. They were roving inspectors who moved constantly about the plant. The degree of control was such that the contractor could not move a piece of equipment from one part of the plant to another without consent. All of the equipment was under con-

tinual inspection; it was called "preventive maintenance." In addition, if an inspector saw an unfamiliar piece of material in a machine, he would make immediate inquiry to ascertain if it represented defense contract work.

Use of the premises and equipment by Reaction and later by Thiokol was agreed to be at the pleasure of the government. The permission to use could be terminated in whole or in part at any time on written notice to the contractor. The notice could be made effective immediately. The contract provision specifically said the termination "shall become effective on the date appearing in the notice." Reaction was given an option to purchase all the buildings comprising the Denville plant at any time before termination. The option gave no right to buy a single building. It had to be exercised with respect to all the facilities or not at all. (We were advised at argument that Thiokol recently exercised the option, thus placing the premises on the regular tax roll for the future.)

Based on the assumption that the relationship between the United States and Reaction constituted a leasehold and was taxable as such under *L.* 1949, *c.* 177, the Township of Denville imposed assessments on Reaction for 1957 and 1958. The Morris County Board of Taxation approved the assessments, whereupon Thiokol instituted this action in the Superior Court, Law Division, challenging their validity. The United States was permitted to intervene as a supporting plaintiff. The attack raised problems under both Federal and State Constitutions and as to the proper construction and application of the terms "leased" and "leasehold estate" under the cited statute. No issue was presented as to the amount of the assessments. In view of the conclusion we have reached, it is not necessary to proceed beyond the issue of applicability of the statute.

The 1949 Leasehold Taxing Act provides:

"When real estate exempt from taxation is leased to another whose property is not exempt, and the leasing of which does not make the real estate taxable, the leasehold estate and the appurtenances shall

be listed as the property of the lessee thereof, or his assignee, and assessed as real estate." *L.* 1949, *c.* 177, *p.* 566, § 1. (*N. J. S. A.* 54:4–2.3)

Thiokol and the United States contend that the contract between them for the use of the government facilities did not constitute a lease, and therefore no taxable "leasehold estate" existed for the years 1957 and 1958. The township, on the other hand, claims the status created possesses the essential characteristics of a lease and consequently subjects Thiokol to taxation.

In seeking the proper application of the statute we must be mindful that the Legislature deliberately chose the terms "leased" and "leasehold estate," and limited taxability to such estates, as distinguished from other and lesser permissive uses or limited custodial relationships. The restrictive quality of our act can be pointed up by reference to the much broader compass of the Michigan law which seems to have been designed to reach such use of exempt property as is involved here. The enactment of that state, so far as pertinent, says:

"When any real property which for any reason is exempt from taxation is *leased, loaned or otherwise made available to and used by* a private * * * corporation in connection with a business conducted for profit * * * [it] shall be subject to taxation in the same amount and to the same extent as though the lessee or user were the owner of the property * * *." *P. A.* 1953, *No.* 189, *M. S. A.* §§ 7.7(5), 7.7(6), *Comp. Laws Supp.* 1956, §§ 211.181, 211.182. (Emphasis added)

▮▮▮▮▮ Putting aside the constitutional objections based on alleged discrimination which we do not reach, there is no doubt that if the contract between Reaction (and later Thiokol) and the United States amounts to a lease, the assessments would have to be sustained. *United States v. City of Detroit,* 355 *U. S.* 466, 78 *S. Ct.* 474, 2 *L. Ed. 2d* 424 (1958). Of course, property owned and in the possession of the United States would not be taxable. *M'Culloch v. Maryland,* 4 *Wheat.* 316, 17 *U. S.* 316, 4 *L. Ed.* 579 (1819); *United*

*States v. County of Allegheny,* 322 *U. S.* 174, 64 *S. Ct.* 908, 88 *L. Ed.* 1209 (1944) ; *United States v. Kingsley,* 41 *N. J.* 75 (1963). It is common knowledge, however, that in recent times the federal government has made extensive acquisitions of land in many jurisdictions and by doing so removed the property from the local assessment rolls. The increased tax burden thus imposed upon other landowners of the community has resulted in a liberal acceptance by the United States Supreme Court of the constitutionality of state statutory schemes for imposition of nondiscriminatory taxes with respect to federally-owned property or interests therein when possession and control are transferred to private persons for use in connection with their profit-making ventures. And the fact that the ultimate burden of the tax would fall indirectly on the United States because of the contractual arrangement with the private occupier (as in the present case) has not been regarded as invading the supremacy clause of the Federal Constitution. *United States v. City of Detroit, supra; Phillips Chemical Co. v. Dumas School Dist.,* 361 *U. S.* 376, 80 *S. Ct.* 474, 4 *L. Ed.* 2d 384 (1960) ; *Alabama v. King & Boozer,* 314 *U. S.* 1, 62 *S. Ct.* 43, 86 *L. Ed.* 3 (1941). Thus, the statutory scheme of Michigan, to which we have adverted above, was declared valid constitutionally where property owned by the United States was leased to Borg-Warner Corporation for use in its private profit-motivated business, and where other property similarly owned was used by Continental Motors under a permit which could be terminated at the will of the government. The statute sustained by the United States Supreme Court authorized taxation of property otherwise exempt, when *leased, loaned or otherwise made available to and used* by a private corporation in connection with a business conducted for profit. *United States v. City of Detroit, supra; United States v. Township of Muskegon,* 355 *U. S.* 484, 78 *S. Ct.* 483, 2 *L. Ed.* 2d 436 (1958) ; and see, Rollman, "Government Immunity From Taxes," 38 *N. D. L. Rev.* 26 (1962) ; Van Cleve, "States Rights and Federal Solvency," 1959 *Wis. L. Rev.* 190.

It has been said that "[w]ise and flexible adjustment of intergovernmental tax immunity calls for political and economic considerations of the greatest difficulty and delicacy," *United States v. City of Detroit, supra,* 355 *U. S.,* at *p.* 474, 78 *S. Ct.,* at *p.* 479, 2 *L. Ed.* 2d 424, and that "nice distinctions are to be expected," *City of Detroit v. Murray Corp.,* 355 *U. S.* 489, 505, 78 *S. Ct.* 458, 492, 2 *L. Ed.* 2d 441, 466 (1958) (Justice Frankfurter, opinion concurring in part, dissenting in part). Therefore, when a state legislature ventures into this sensitive area in order to impose a tax on normally-exempt federal government property, the judicial role is to interpret and apply the legislation carefully within the chosen limits as revealed by the specific language used. *Cf. Fort Hamilton Manor, Inc. v. Boyland,* 4 *N. Y.* 2d 192, 173 *N. Y. S.* 2d 560, 149 *N. E.* 2d 856 (*Ct. App.* 1958).

This brings us to a definition of a leasehold estate and to an appraisal of the relationship created by the terms of the contracts between Reaction, Thiokol and the United States. Ordinarily when a lease is made we find an agreement by the owner-lessor to turn over specifically-described premises to the exclusive possession of the lessee for a definite period of time and for a consideration commonly called rent. Although no absolute requirement exists for the use of particular words, the instrument is usually studded with terms (lacking here) such as "lease," "let," "demise," "grant" and the like. Frequently, a lease is spoken of as a hiring of land, or a sale of the possession, occupancy and profits of land for a term. *Edgeboro v. East Brunswick Tp.,* 31 *N. J. Super.* 238, 244 (*App. Div.* 1954); *United States v. Richfield Oil Corp.,* 99 *F. Supp.* 280 (*S. D. Cal.* 1951), affirmed 343 *U. S.* 922, 72 *S. Ct.* 665, 96 *L. Ed.* 1334 (1952); *Staples v. Bernabucci,* 119 *Conn.* 443, 177 *A.* 380 (*Sup. Ct. Err.* 1935); 3 *Thompson, Real Property,* § 1046, *pp.* 161, 163, 164; § 1047, *pp.* 168, 171, 172 (1959).

Unquestionably agreements respecting the use of land can be made by an owner which fall short of a leasehold. License, permit, privilege and limited custodial use are open

to consensual arrangements. 3 *Powell, Real Property,* § 428, *pp.* 514–519 (1952); compare *Passaic & Hackensack Bridges v. State,* 22 *N. J. L.* 593 (*E. & A.* 1849). The difference between a lease and license or similar limited status, although difficult to distinguish at times, is that a lease gives exclusive possession of the premises against all the world, including the owner, while a license confers a privilege to occupy under the owner. *Tips v. United States,* 70 *F. 2d* 525 (5 *Cir.* 1934); *Case v. Kadota Fig Ass'n of Producers,* 207 *P. 2d* 86, 95 (*Cal. D. Ct. App.* 1949), modified 35 *Cal. 2d* 596, 220 *P. 2d* 912 (*Sup. Ct.* 1950); *Strandholm v. Barbey,* 145 *Ore.* 427, 26 *P. 2d* 46 (*Sup. Ct.* 1933); 32 *Am. Jur., Landlord & Tenant,* § 5; 51 *C. J. S. Landlord & Tenant* § 202e(2); *Powell, supra,* § 428. A license or similar status is generally revocable at the pleasure of the owner and gives occupancy so far as necessary to engage in the agreed acts or the performance of agreed services and no further; a lease gives the right of exclusive possession for all purposes not prohibited by its terms. 32 *Am. Jur., supra,* § 5.

In the final analysis whether a particular agreement is a lease depends upon the intention of the parties as revealed by the language employed in establishing their relationship, and, where doubt exists, by the circumstances surrounding its making as well as by their course of operation under it. 51 *C. J. S. Landlord & Tenant* § 202e. And, in situations where the ambiguity or doubt gives rise to a factual question as to the intention of the parties, the burden is on the party asserting it to demonstrate existence of the lessor-lessee relationship. Moreover, in the resolution of ambiguity or doubt, absence of (1) a stipulation for rent as such, or other consideration regarded by the parties as constituting payment for the transfer of possession, and (2) a term; and presence of (1) limitations on exclusive possession and control of the premises, and (2) a right in the owner to revoke the permit to use at any time, are factors militating against the existence of a lease. In this connection, as an early case said:

"* * * [R]ent is not essential to a lease; for, from favor, or valuable consideration, the tenant may have a lease without any render. Yet that must be in a case where a lease was clearly intended. When, upon construction, it be doubtful whether a lease was intended or not, then it constitutes a very important circumstance, that rent was not reserved, *eo nomine* or substantially." *State v. Page*, 1 *Spears' Law* 408, 40 *Amer. Dec.* 608 (*S. C. A. & E.* 1843).

In the present case the contracting parties assert their purpose was not to create a lease, and that the language employed in expressing their purpose did not and should not result in imposition on them of that status as a matter of law. And they say, so far as any ambiguity may exist from the language, the history of their preliminary negotiations, as well as the practical construction they applied in living under the agreement, makes it clear the United States did not intend to become a lessor nor Reaction a lessee. Only the taxing authorities, strangers to the contract, contend that in spite of the parties' intention and their written efforts to effectuate it, in the eyes of the law they produced a lease.

The United States claims that it intended to confer on Reaction a license, a permit to use the premises in question for the purpose of efficient performance of work considered essential to the national defense. The aim was to provide or make available adequate government-owned facilities for Reaction, one of the few producers of the specialized type of liquid propellant rocket engines in which the Armed Services were interested. The preliminary report of the Bureau of Aeronautics to the Assistant Secretary of the Navy in recommending the project, said the proposed "facilities program * * * will provide the Navy Department with a prime source of liquid rocket engines and the like * * *" and "should result in immediate and substantial savings to the Government in time and money * * *." All of the preliminary surveys, reports and recommendations to the Navy Department by the various representatives assigned to study the matter sought approval and authority to execute a contract under which Reaction would be given permission to use the government-owned property for the performance of particular

defense contracts, without the payment of any rent or charge for the use, but subject to revocation at any time at the instance of the Navy Department. It is obvious that the Chief of the Bureau of Aeronautics was aware of a distinction between the use arrangement recommended and a lease when making his recommendation for approval of the proposed terms and conditions of the projected contract. After requesting the Secretary of the Navy to approve the suggested terms, he pointed out that "Following the emergency, the plant and machine tools and equipment may be *leased* under P. L. 364 for general manufacturing purposes, or in the case of the machinery and equipment above, placed in the Government industrial reserves." (Emphasis added)

In submitting the project to the Committees on Armed Services of the House of Representatives and the Senate, the Navy Department reported that it "proposes to provide a facility for the development of the guided missile program at the subject location for operation by its contractor, the Reaction Motors, Inc." The submission pointed out also that Reaction was to erect its own administrative building on its own property at its own expense, and that "The design of the [Navy] plant facilities is such that the plant may be operated as a unit separate and apart from the Reaction Motors holdings."

The Navy Department authorized and executed the contract under consideration in the terms proposed. Under it, Reaction acquired permission to use the tax-exempt property of the United States for limited purposes designated by the agreement, subject to revocation at any time at the pleasure of the government, and subject to considerable control and supervision by the government over the manner of use and exercise of the possessory rights acquired. The undisputed evidence adduced in the Law Division revealed the substantial measure of concurrent use of the premises by Navy representatives to protect the government's interest in the proper maintenance thereof, their exclusive devotion by Reaction to the performance of defense contracts, the quality of the

work being performed, and the adequacy of the security measures being taken to protect the work and the nature of the product being researched, developed or manufactured. The fact that use of the property was under the close, direct and watchful immediate supervision and control of representatives of the Navy must be regarded as influential in appraising Reaction's status.

As we have already said, it is sometimes difficult to draw the line between a lease of premises and the more qualified right of use granted by licenses, permits and similar limited custodial privileges. The present case is not free from that difficulty. The United States and Thiokol agree the intention was not to make a lease, and that the language of their agreement, as well as their operation under it, proves their purpose was brought to the desired fruition. At oral argument the government represented that its purpose was to construct and own a Naval facility for use in its program of rocket motor and missile development. It wished to permit its contractor who was expert in the field to use the facility in aid of the program but also to retain sufficient control to enable the use to be terminated for any reason at any time. And it urges the intention should not be frustrated by a judicial straining of the language to find the attributes of a lease. We accept the good faith of the representations.

It must be remembered that the Legislature chose to limit the taxability of otherwise exempt real property in the use of one other than the owner to instances where the relationship between them was that of lessor and lessee. That choice is binding on our courts, just as the more expansive basis for tax imposition established by the Michigan legislature provided the scope of taxability in that state. Research has disclosed no case in this or any other jurisdiction dealing with the propriety of a tax assessment imposed under a statute like ours on a property use contract of the type presented here. A few cases, however, illumine the path we feel should be taken.

In *Kern-Limerick, Inc. v. Scurlock*, 347 *U. S.* 110, 74 *S. Ct.* 403, 98 *L. Ed.* 546 (1954), the United States (Depart-

ment of the Navy) contracted for the building of an ammunition dump. The contractor bought tractors to be used in the work. Arkansas had a sales tax which applied to such purchases by a private person, and undertook to impose it on the contractor. The contract with the government provided that purchases of materials or equipment should be in the name of the United States with the contractor acting as purchasing agent, the United States to be directly liable to the vendor and title to the articles to pass to the United States from the seller. The contractor was to pay the purchase price and be reimbursed by the government. It was agreed also that if a sales tax were imposed on purchases, the contractor would seek a refund and pay the amount recovered, if any, to the government. The order for the tractors, signed by the contractor, recited that the purchase was being made by the government which "shall be obligated" to the vendor for the price but the "contractor shall handle all payments on behalf of the Government" and the "vendor agrees to make demand or claim for payment * * * from the Government by submitting an invoice to the contractor."

The United States Supreme Court struck down the tax on the ground that the government was the purchaser, became owner of the tractors and, under the doctrine of sovereign immunity, could not be burdened by the state exaction. Among other things, the court said:

"Nor do we think that the drafting of the contract by the Navy Department to conserve Government funds, if that was the purpose, changes the character of the transaction. As we have indicated, the intergovernmental submission to taxation is primarily a problem of finance and legislation. But since purchases by independent contractors of supplies for Government construction or other activities do not have federal immunity from taxation, the form of contracts, when governmental immunity is not waived by Congress, may determine the effect of state taxation on federal agencies, for decisions consistently prohibit taxes levied on the property or purchases of the Government itself." 347 *U. S.*, at *pp.* 122, 123, 74 *S. Ct.*, at *p.* 411, 98 *L. Ed.* 546.

See, also, *General Dynamics Corp. v. County of Los Angeles,* 51 *Cal. 2d* 59, 330 *P. 2d* 794 (*Sup. Ct.* 1958).

On the whole record, in light of the authorities and texts referred to and the representations of the parties, we cannot say the township and the Board of Taxation have demonstrated that the contract between the United States and Reaction and Thiokol has sufficiently distinctive characteristics of a lease to warrant holding it to be a lease. Accordingly, we find no leasehold estate in existence in 1957 or 1958 which was subject to taxation by virtue of *L.* 1949, *c.* 177. For this reason the judgment of the Law Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For reversal*—None.