RIMM, J.T.C.
I
Plaintiff, Claremont Health Systems, Inc. (hereinafter, “Claremont Health Systems”), claims an exemption from local property taxes for the 1994, 1995, and 1996 tax years on a building located at 1515 Hulse Road in the Borough of Point Pleasant. The property is designated as Block 256, Lot 15 on the municipal tax map. The building at issue is a one-story, 34,000 square foot *607 structure with a partial basement situated on 2.3 acres of land. The building was constructed in 1972 and an addition was built in 1985.
On November 1,1993, plaintiff filed a statement with the Office of the Tax Assessor for the Borough of Point Pleasant, seeking an exemption from local property taxes under N.J.S.A. 54:4-3.6 for the building on Block 256, Lot 15. On December 22, 1993, the assessor denied the exemption request and assessed the building at $3,066,400. Subsequently, plaintiff filed a petition of appeal with the Ocean County Board of Taxation. The county board affirmed the assessment without prejudice at the request of both parties. The process was repeated for the 1995 and 1996 tax years. Following the affirmance of the assessment in each year by the county board of taxation, plaintiff filed a timely complaint in the Tax Court. In all of the eases, issues were raised concerning qualification for exemption from local property taxation as to whether: (1) plaintiff is the owner of the building; (2) ownership of only the building and not the land can qualify the building for exemption; (3) plaintiff is organized exclusively for hospital purposes; and (4) the “hospital purposes” exemption under N.J.S.A. 54:4-3.6 is constitutional. The question of the constitutionality of the “hospital purposes” exemption arises as a result of the amendment to the statute effective July 1, 1993. L. 1993, c. 166, § 1.
On January 2,1996, following defendant’s notice that it intended to challenge the constitutionality of the “hospital purposes” exemption of N.J.S.A. 54:4-3.6, the Attorney General of the State of New Jersey, as an intervenor in the matters, filed a motion to dismiss, or, in the alternative, for partial summary judgment on the constitutional issue. On May 31, 1996, plaintiff and defendant each filed a motion for summary judgment pursuant to R. 4:46, each party contending that there is no material issue of fact in the case and that it is entitled to judgment as a matter of law. The motion of the Attorney General of the State of New Jersey was held pending resolution of the non-constitutional issues.
*608 II
Prior to September 1992, the building at issue was operated as a for-profit nursing home with 112 skilled and intermediate care nursing beds. The facility was known as the Claremont Care Center (hereinafter, “the center”). The first floor of the building included executive offices, nurses’ stations, a dining and recreation room, a kitchen, waiting rooms, utility rooms, television rooms, a laundry area, an employee lounge, tub and shower rooms, therapy rooms, and guest rooms. Additionally, there were storage areas, a mechanical room, an electrical room, and a classroom located in the basement of the building.
Genesis Health Ventures of Point Pleasant, Inc. (hereinafter, “Genesis Point Pleasant”), a for-profit New Jersey corporation, originally owned and operated the center. Genesis Point Pleasant was a wholly-owned subsidiary of Genesis Health Ventures, Inc. (hereinafter, “Genesis Health”), a for-profit Pennsylvania corporation. As of September 1,1992, Genesis Point Pleasant employed a total of 124 people to operate the nursing home. For the fiscal year ending September 1991, the center’s statement of operations showed total net revenue of $3,897,532 and total expenses of $3,904,416, resulting in a loss of $6,844.
At some time before September 1992, Hoosier Care, Inc. (hereinafter, “Hoosier Care”), a non-profit Indiana corporation, entered into negotiations with Genesis Health regarding the center. Hoosier Care’s certificate of incorporation and by-laws filed with the State of Indiana provide that the corporation is organized to establish, operate, and manage nursing homes, hospitals, related health care facilities, and “retirement housing for elderly persons.”
Hoosier Care has purchased several health care facilities through subordinate companies in transactions involving state economic development authorities. As part of these transactions, the development authorities issued tax exempt bonds to finance the acquisition of each facility. The bonds were purchased by underwriters and then sold to investors. Hoosier Care purchases health care facilities through subordinate companies in an attempt to increase its ability to obtain bond financing and gain favorable *609 management contracts for the care centers. By creating a separate entity to acquire each facility, lenders and management companies judge each care center separately, without considering the centers that Hoosier Care has acquired in the past or may acquire in the future.
In February 1992, during negotiations with Genesis Health[1] relating to the center, Hoosier Care formed a wholly-owned subsidiary, Claremont Health Systems, a non-profit New Jersey corporation. Claremont Health Systems is plaintiff in the present case. Its certificate of incorporation provides in part as follows:
The Corporation shall be organized and thereafter operated exclusively for public charitable uses and purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Such charitable purposes of the corporation include establishing, owning, maintaining and operating hospitals, nursing homes and related health care facilities, including retirement housing for elderly persons and performing such other acts necessary or incidental to the above stated purposes.
Claremont Health Systems’ corporate by-laws indicate that, like its parent company, Hoosier Care, the corporation has full power and authority “[t]o establish, acquire, own, maintain, operate, and manage nursing homes, hospitals, and related health care facilities, and retirement housing for elderly persons . . . .”
In September 1992, Claremont Health Systems and Genesis Point Pleasant, engaged in a complex series of transactions concerning the center and the land on which it is built. These transactions were all financed by the issuance and sale of $6,400,-000 in Health Care Facility Revenue Bonds by the New Jersey Economic Development Authority to an underwriter, A.H. Williams and Company.
The Health Care Facility Revenue Bonds were issued pursuant to a trust indenture dated September 15, 1992, between the New Jersey Economic Development Authority and the trustee for the financing, Fidelity Bank, National Association. The bonds were made payable from funds held by the trustee and payments were *610 to be made by Claremont Health Systems from its planned operation of the center, pursuant to a loan agreement between Claremont Health Systems and the New Jersey Economic Development Authority. The obligations of Claremont Health Systems under the loan agreement were secured by a mortgage and security agreement, dated September 15, 1992, between Claremont Health Systems and the trustee, Fidelity Bank, National Association, as assignee from the New Jersey Economic Development Authority.
Contemporaneously with the issuance of the bonds, Claremont Health Systems and Genesis Point Pleasant executed several documents relating to the center, all dated September 15, 1992. One document was labelled a “Ground Lease.” Another document was labelled a “Deed.” A third document was labelled an “Asset Purchase Agreement.” A fourth document was labelled a “Management Agreement,” and was executed by Claremont Health Systems and Total Care Systems, Inc., a for-profit subsidiary of Genesis Health.
For ease in understanding the various parties involved in this matter, the following summary of the parties is set forth:
1. Genesis Health Ventures of Point Pleasant, Inc. (Genesis Point Pleasant), a for-profit New Jersey corporation. Former operator of the Claremont Care Center at the subject property. A wholly-owned subsidiary of Genesis Health.
2. Genesis Health Ventures, Inc., (Genesis Health) a for-profit Pennsylvania corporation. The parent company of Genesis Point Pleasant which is a wholly-owned subsidiary. The parent company of Total Care which is a wholly-owned subsidiary.
3. Total Care Systems, Inc. (Total Care), a for-profit Pennsylvania corporation. A wholly-owned subsidiary of Genesis Health Ventures, Inc.
4. Claremont Health Systems, Inc. (Claremont Health Systems), a non-profit New Jersey corporation. Plaintiff in this matter. A wholly-owned subsidiary of Hoosier Care, Inc.
*611 5. Hoosier Care, Inc., a non-profit Indiana corporation. The parent company of Claremont Health Systems, which is a wholly-owned subsidiary.
According to Dr. Bruce Parker Hutson, the president of both Hoosier Care and Claremont Health Systems, after being told during negotiations for the acquisition of the center that “Genesis did not want to part with the land ... [because the Chairman of Genesis] felt that someday down the road ... the land would be very valuable ...,” Claremont Health Systems entered into a “Ground Lease” with Genesis Point Pleasant for the land on which the center is built.
In Section 1.01 of the document labelled “Ground Lease” and dated September 15, 1996, the “demised premises” are listed as including all the land under the building and all adjoining land, all easements and other rights appurtenant to the land, and all improvements, other than the building. That section also indicates, however, that “[t]he demised premises and the building are sometimes ... collectively called the ‘Property’ ” in the “Ground Lease” document.
Section 5.02 of the lease document provides that, unless Claremont Health Systems obtains the prior written consent of Genesis Point Pleasant, Claremont Health Systems “shall not use or occupy the Property or permit the Property to be used or occupied except for a skilled care nursing home.” (emphasis supplied). Section 6.01 of the lease says that Claremont Health Systems must “keep the entire Property ... in good and clean order and condition ... and ... promptly make all necessary or appropriate repairs, replacements and renewals thereof, whether interior or exterior, structural or non-structural . . . .” (emphasis supplied). Section 7.01 of the lease states that Claremont Health Systems, at its own expense, may make any reasonable alterations of and additions to “the Property or any part thereof,” provided that such alterations or additions “shall not change the general character of the Property, or reduce the fair market value thereof below its value immediately before such alteration or addition . . . .” (emphasis supplied).
*612 Section 8.01 of the lease document provides that, “if any of the Building is damaged, destroyed, or rendered untenantable by fire, the elements or any other cause, such damage or destruction or conditions rendering said Property untenantable shall not operate to terminate [the] lease . . . .” (emphasis supplied). Instead, the lease is to continue in full effect for as long as any loan from the bond sale by the New Jersey Economic Development Authority remains outstanding. Section 13.01 of the lease requires Claremont Health Systems, at its own expense, to insure “the Building” against loss, damage, or destruction, in an amount equal to its full insurable replacement value. The amount and type of insurance, as well as the designation of insured parties, however, are to be controlled by the loan documents from the bond financing agreement with the New Jersey Economic Development Authority for as long as any loan from the sale of the bonds remains outstanding.
The term of the lease is thirty-five years. The rent called for under the lease is $50,000 per year with the provision that such “basic rent” shall be increased annually beginning after the first year of the lease at a rate of 3.5% of the basic rent payable for the immediately preceding lease year. However, Section 4.03 of the lease document states that, as long as Genesis Point Pleasant or any of its affiliates serves as the manager of the nursing home of the property, or is terminated as manager for cause, pursuant to the management agreement executed simultaneously with the ground lease, then Claremont Health Systems can pay the rent under the lease after it pays any debt service, management fees, and operating expenses owed for the center. If Genesis Point Pleasant or any of its affiliates is terminated as the manager of the nursing home for any reason other than a termination for cause under the management agreement executed simultaneously with the ground lease, basic rent is to be paid as part of operating expenses for the care center.
Article XXI of the lease document provides that, “if Tenant shall fail in the performance and observance of any of the material agreements, conditions and terms herein contained on Tenant’s *613 part to be performed or observed, ...” the lease can be terminated by the landlord. Genesis-Point Pleasant can also terminate the lease if a receiver is appointed for Claremont Health Systems, Claremont Health Systems is adjudicated bankrupt, or makes an assignment for the benefit of its creditors, or if Claremont Health Systems does not pay the rent and Genesis-Point Pleasant deposits funds with the trustee, Fidelity Bank, National Association, as assignee from the New Jersey Economic Development Authority, necessary to repay the Health Care Facility Revenue Bonds.
Section 27.01 of the lease document provides as follows:
Upon the expiration of the Lease Term or upon earlier termination of this Lease for any reason, ail right, title and interest of Tenant in and to the Property (including without limitation, Tenant’s estates, right and title in and to the Building) shall revert to Landlord and become Landlord’s property, free and clear of all claims against them by Tenant or any third person, and Tenant shall defend and indemnify Landlord against all liability and loss arising from such claims or from Landlord’s exercise of rights conferred by this Article, and Tenant shall cooperate with Landlord and shall execute and deliver any and all documents required by the Landlord to evidence such reversion of the title to the Landlord.
Section 29.01 of the lease document states that,
[o]n the Expiration Date or earlier termination of the Lease Term, title to the Demised Premises and the Building will be free and clear of all liens, encumbrances, easements and restrictions other than those existing on the date hereof or created by Landlord or with the express written consent of Landlord.
Article XXX of the lease document details the environmental covenants agreed to by Claremont Health Systems and Genesis-Point Pleasant. Section 30.05 states that, for the purposes of Article XXX, “the Demised Premises shall include ... all improvements ____”
In addition to the “Ground Lease” document, Genesis-Point Pleasant and Claremont Health Systems also executed a document labelled “Deed” on September 15, 1992. The document was recorded by the Ocean County Clerk’s office on October 20, 1992.
The parties marked up a pre-printed form of deed, striking out certain terms and words that were printed on the form. For example, in a part of the form labelled, “transfer of ownership,” the parties crossed out the printed words (which are now unintelligible) and typed the phrase, “the building (as hereinafter de *614 finedQ] ...” above the crossed out language. Further down on the first page of the form, the parties described the interest being transferred as “all of Grantor’s right title and interest, if any, in and to those certain buildings, structures, footings, foundations, fixtures, equipment, columns, piles and other installations (collectively, the ‘buildings’) at or above that certain lot or parcel of land ...” designated as Block 256, Lot 15 on the municipal tax map.
On the second page of the form, the parties included the following language:
EXCEPTING AND RESERVING unto Grantor [Genesis-Point Pleasant] all right, title and interest in and to the above described land and a reversionary interest in and to the Building upon expiration or sooner termination of that certain Ground Lease Agreement dated as of September 15, 1992, by and between Grantor, as landlord, and Grantee [Claremont Health Systems], as tenant, with respect to the land, a memorandum of which is intended to be recorded in the Clerk’s Office of Ocean County New Jersey concurrently with the recording of this Deed. It being expressly understood and agreed that this Deed does not convey to Grantee any right title or interest in and to said land and the Building reverts to Grantor upon expiration of the Ground Lease.
Along with the “Ground Lease” and the “Deed,” Genesis Point Pleasant and Claremont Health Systems executed a document entitled “Asset Purchase Agreement,” dated September 15, 1992. The document recites Genesis Point Pleasant’s desire “to sell and transfer” certain “assets” of the center to Claremont Health Systems. The list of “transferred assets” in the document includes the following: the nursing home building; all furnishings, equipment, fixtures, machinery, appliances, and personal property located in the nursing home or used in operating the nursing home; all leasehold interests held by Genesis-Point Pleasant in connection with its operation of the nursing home; interests in all assignable contracts relating to the operation of the nursing home; all of the nursing home business records and patient lists and records; all transferable licenses; all resident trust property; all grantees relating to any of the property transferred; all inventories of food and business or medical supplies then held for use at the nursing home; and all trade names of the nursing home.
Article I, section 1.01 of the “Asset Purchase Agreement” document provides that,
*615 [notwithstanding anything else to the contrary herein contained, Seller is not selling and Buyer is not purchasing: (I) the parcel of real property described in Exhibit 1.01A attached hereto and together with all easements, tenements, hereditaments, appurtenances, rights, privileges, immunities and other benefits belonging or appertaining thereto which run with said real property including all buildings, structures and other improvements located thereon exclusive of the Facility [which is defined as the nursing home building] (collectively, the Real Property); provided, however, the Real Property shall be the subject of a separate ground lease of even date herewith between the parties hereto (the “Ground Lease”); ____
Article II, section 2.01 of the “Asset Purchase Agreement” document states that the “purchase price” payable by Claremont Health Systems to Genesis Point Pleasant for the “Purchased Assets” was to “be an aggregate of $4,790,000” and was to “be paid at Closing in cash.” Section 2.01 of the document additionally provides that “[t]he parties hereby agree to the allocation attached hereto as Exhibit 2.01A of the Purchase Price among the assets constituting the Purchased Assets, and agree to use such allocation for all purposes including tax purposes.” Exhibit 2.01A lists the purported allocation of the $4,790,000 as follows:
Equipment $ 170,000.00
Inventory $ 30,000.00
Real Property (Building) $4,590,000.00
TOTAL $4,790,000.00.
In addition to the “Ground Lease,” the “Deed,” and the “Asset Purchase Agreement,” Claremont Health Systems also executed a fourth document relating to the center on September 15, 1992. Claremont Health Systems entered into a “Management Agreement” regarding the center with Total Care Systems, Inc. (hereinafter, “Total Care”). Total Care is one of several for-profit subsidiaries owned by Genesis Health Ventures and is a Pennsylvania corporation. Total Care is a management, marketing, and development company that services a number of long-term care and life-care facilities. Genesis Health Ventures purchased Total Care in June 1990.
Under the “Management Agreement” document, Claremont Health Systems agreed to employ Total Care as the operating manager of the center for an initial term of five years. According *616 to Dr. Bruce Parker Hutson, the president of both Hoosier Care and Claremont Health Systems, the parties chose this term length to meet Internal Revenue Service standards so that the management agreement would not be construed as a “lease buy-back” or “sham,” allowing Claremont Health Systems to retain its federal tax exemption.
Total Care’s responsibilities under the agreement included all managerial and operational services related to the center, ranging from obtaining licensing for the care center to the employment and supervision of the staff. Additionally, Total Care agreed to oversee a planned renovation of the center.
In return for its management of the center, Total Care was to receive the following “Management Fee[s]” under the agreement:
Year Annual Fee Monthly Fee
1 $273,300 $22,775
2 $302,200 $25,183
3 $319,200 $26,600
4 $338,300 $28,192
5 $358,600 $29,883
These fees were‘to be paid in addition to all other reimbursement due to Total Care under the “Management Agreement.” For example, Total Care was to receive $3,000 for each Medicare or Medicaid report it prepared as manager. Additionally, the document provides that Total Care will apply, in the name of Claremont Health Systems, for an exemption from real estate taxes for the nursing home. If Total Care is successful in obtaining the exemption, Claremont Health Systems is to pay Total Care a “one-time fee of $50,000.”
Section 1.4(a)(6) of the “Management Agreement” provides that, while generally, all costs for the facility are to be paid by Claremont Health Systems, Claremont Health Systems “shall bear no such cost and expense incident to the Renovation Project; . . . .” According to Dr. Bruce Parker Hutson, following the transfer of assets, more than a million dollars was spent on renovating the care center.
*617 The September 30,1992 Official Offering Statement of the New Jersey Economic Development Authority, for the Health Care Facility Revenue Bonds, indicates that the issuance of the bonds provided “approximately $978,000 for certain renovations to the Facility (the ‘Renovation Project’) ...” The Offering Statement describes the “Renovation Project” as consisting of
(i) the construction of additional rooms at the Facility to add 6 additional nursing beds, (ii) the renovation and expansion of various portions of the Facility, including the construction of additional offices, activities rooms and other improvements and the conversion of the heating system for the Facility from oil to gas, (iii) the renovation of exterior portions of the Facility, including the construction of a new entrance way, and (iv) other miscellaneous improvements.
According to the Offering Statement, the heating system conversion was to take place “promptly after the date of the Company’s [Claremont Health Systems’] acquisition of the Facility and in time for the system to be used in the Fall of 1992.” The other renovations were to be completed by September 30, 1993. The Offering Statement also indicates that Genesis Point Pleasant “will guarantee completion of the various portions of the Renovation Project at a total cost not exceeding $978,000 pursuant to a Guaranty dated the date of the issuance of the Bonds in favor of the Company and the Trustee.”
The Offering Statement also recites another agreement by either Genesis Point Pleasant or Genesis Health[2] and Claremont Health Systems with regard to the nursing home. The Offering Statement states that,
[i]n order to provide additional liquidity to support the operations of the Facility, upon the issuance of the Bonds, Genesis and the Company [Claremont Health Systems] will enter into the Genesis Loan Agreement pursuant to which Genesis will agree to provide the Genesis Line of Credit up to a maximum amount of $500,000, as and when such amounts are required to pay Operating Expenses of the Facility, which include the interest on, but not the principal of, the Bonds. The obligation of Genesis to provide advances under the Genesis Line of Credit will terminate when the cash and permitted investments held in the Operating Reserve Fund equal $500,000 or more and no principal or interest is due under the Genesis Line of Credit. The obligation of Genesis to make further advances under the *618 Genesis Line of Credit may also be terminated if either (I) the Management Agreement is terminated on the third anniversary date (with the consent of the Owners of more than 50% in aggregate principal amount of Bonds Outstanding as required by the Agreement), or (ii) the Management Agreement is not renewed at the end of five years; provided, however, that in each case, a replacement line of credit or liquidity facility is provided and approved by the owners of more than 50% in aggregate principal amount of Bonds Outstanding. Amounts payable by the Company to Genesis will be evidenced by the Genesis Note, the repayment of which will be secured by a security interest in favor of Genesis in the accounts receivable of the Facility which will be subordinated to the Trustee’s security interest under the Mortgage in the Gross Revenues.
A KPMG Peat Marwick financial feasibility study, dated September 14, 1992, included with defendant’s moving papers, indicates that, beyond the issuance of the Health Care Facility Revenue Bonds, “[o]ther necessary funds to finance the purchase of the Facility are assumed to be provided from an equity contribution from Genesis Health Ventures, Inc. (Genesis) in accordance with a contribution agreement between [Claremont Health Systems] and Genesis (Contribution Agreement).”
The Offering Statement also indicates that Genesis Point Pleasant and Claremont Health Systems gave a “mortgage lien on and security interest in” Genesis Point Pleasant’s “fee interest in the Land” and Claremont Health Systems’ “interest in the Land, the Ground Lease, the Healthcare Facility, the Personal Property and the Gross Revenues” of the nursing home, to secure payment of all sums due under the Bonds, the Notes, the Loan Agreement, and the Indenture. According to the Offering Statement, if the property is ever foreclosed and Genesis Health or one of its subsidiaries has been terminated as manager of the nursing home, without cause, Genesis Health would be entitled to $500,000 from any proceeds received from the foreclosure.
Ill
The relevant portions of N.J.S.A. 54:4-3.6 provide as follows:
The following property shall be exempt from taxation under this chapter: ... all buildings actually used in the work of associations and corporations organized exclusively for hospital purposes, provided that if any portion of a building used for hospital purposes is leased to profit-making organizations or otherwise used for purposes which are not themselves exempt for taxation, that portion shall be subject to taxation and the remaining portion only shall be exempt; ... the land *619 whereon any of the buildings hereinbefore mentioned are erected, and which may be necessary for the fair enjoyment thereof, and which does not exceed five acres in extent; ... provided, in case of all the foregoing, the buildings, or the lands on which they stand, or the associations, corporations or institutions using and occupying them as aforesaid, are not conducted for profit . . . . The foregoing exemption shall apply only where the association, corporation or institution claiming the exemption owns the property in question and is incorporated or organized under the laws of this State and authorized to carry out the purposes on account of which the exemption is claimed . . . . As used in this section, “hospital purposes” includes health care facilities for the elderly, such as nursing homes; residential health care facilities; assisted living residences; facilities with a Class C license pursuant to [N.J.S.A. 55:13B-1 to -21], the “Rooming and Boarding House Act of 1979”; similar facilities that provide medical, nursing or personal care services to their residents; and that portion of the central administrative or service facility of a continuing care retirement community that is reasonably allocable as a health care facility for the elderly.
As indicated, the second sentence of the cited statute provides, in pertinent part: “The foregoing exemption shall apply only where the association, corporation or institution claiming the exemption owns the property in question . . . .” (emphasis supplied). Both plaintiff and defendant agree that, in order to qualify for exemption, plaintiff must “own” the building for which it claims exemption.
Plaintiff argues that the ownership provision of the statute simply requires “legal title, i.e., the deed . . . .” Relying on the “Deed” document executed by Genesis Point Pleasant and Claremont Health Systems on September 15, 1992 and recorded in the Ocean County Clerk’s office on October 20, 1992, plaintiff asserts that this document “conclusively establishes [plaintiffs] legal title to the building.”
Plaintiff contends that it received a “freehold estate” in the building from Genesis Point Pleasant and that it owns the building “in fee simple subject to a reversionary interest” held by Genesis Point Pleasant. Plaintiff does not, however, specify the exact interest in the building that it claims it holds under the “Deed” document. According to plaintiff, since “on all relevant assessing dates, [it] was the legal owner of the building ...,” it is irrelevant that it might not own the property in the future.
*620 In response to plaintiff’s arguments, defendant points to the language in the “Deed” document limiting plaintiffs interest in the building. According to defendant, plaintiffs
interest in the land can only be characterized as nothing more than a non-freehold estate, and a tenuous one at that. Its possession of the building is absolutely limited to a specific period of years (35) and even that term is not definite as the budding can be reclaimed at any time by Genesis Point Pleasant if the ground lease is terminated . . . . Claremont simply has too impermanent and uncertain an interest in the building to be classified as its “owner.”
The distinguishing characteristic of a tenancy for years is that it is “created to endure for any fixed or computable period of time.” Restatement (Second) of Property § 1.4 (1977).[3]
A lease is for a computable period of time when it specifies a formula for determining the beginning and termination dates; and the application of such formula, as of the date of the agreement, will produce a calendar date for the beginning of the lease and a calendar date for its termination.
[Id. at comment a.]
A tenancy for years that will automatically terminate on the occurrence of an event, is known as a “determinable term of years.” Restatement (Second) of Property § 1.7 comment d (1977). A tenancy for years is a non-freehold estate. Roger A. Cunningham et al., The Law of Property § 2.1 at 31 (1984).
In the present case, Claremont Health Systems and Genesis Point Pleasant executed a document labelled, “Deed,” on September 15, 1992. That document provides that Genesis Point Pleasant conveys the budding on Block 256, Lot 15 to Claremont Health Systems, while at the same time,
EXCEPTING AND RESERVING unto Grantor [Genesis Point Pleasant] all right, title and interest in and to the above described land and all right, title and interest in and to the above described land and a reversionary interest in and to the Building upon expiration or sooner termination of that certain Ground Lease Agreement dated as of September 15, 1992, by and between Grantor, as landlord, and Grantee [Claremont Health Systems], as tenant, with respect to the land, a memorandum of which is intended to be recorded in the Clerk’s Office of Ocean *621 County New Jersey concurrently with the recording of this Deed. It being expressly understood and agreed that this Deed does not convey to Grantee any right title or interest in and to said land and the Building reverts to Grantor upon expiration of the Ground Lease.
This “Deed” document, then, expressly incorporates the term of the “Ground Lease” of the land underneath the building, limiting whatever interest Claremont Health Systems might have in the building to “the expiration or sooner termination of’ the lease.
According to the “Ground Lease” document executed by Genesis Point Pleasant and Claremont Health Systems on September 15,1992, the term of the lease of the land underneath the building is thirty-five years. At the end of that fixed and computable period of time, or sooner if the “Ground Lease” is terminated, the building reverts back to Genesis Point Pleasant. Thus, the agreement between Claremont Health Systems and Genesis Point Pleasant, creates a “determinable term of years,” a non-freehold estate. Cf. Restatement of Property § 23 comment d, illustration 6 (1936) (“A owning Blackacre in fee simple absolute, transfers Blackacre using ... [the limitation] ... ‘to B for ten years but not longer than for the period during which Blackacre is used for a salt factory.’ ... B has a determinable estate for years, and A has a reversion.”)
The “Deed” document, does not, as plaintiff has suggested, convey the building to plaintiff “in fee simple subject to a reversionary interest” held by Genesis Point Pleasant. Plaintiff has not specified the exact nature of the “fee simple subject to a reversionary interest” that it claims it owns, but the parties could only accomplish such a conveyance by the creation of an estate in fee simple defeasible, a freehold estate. The estates in fee simple defeasible that are
recognized in Anglo-American law are (1) the fee simple determinable, (2) the fee simple subject to a condition subsequent, and (3) the fee simple subject to an executory limitation. The first two are defeasible in favor of the person who originally created the defeasible fee simple estate or his successors in interest. The fee simple subject to an executory limitation, on the other hand, is defeasible in favor of a person (or persons) expressly designated in the creating instrument other than the person who created the defeasible fee simple or his successors in interest.
[Roger A. Cunningham et al., The Law of Property § 2.3 at 39-40 (1984).]
*622 Here, as the purported reversionary interest is in the party that originally created the estate, the interest created cannot be a fee simple Subject to an executory limitation. Additionally, it cannot be a fee simple subject to a condition subsequent, because the “Deed” document states that the building reverts back to Genesis Point Pleasant automatically upon the expiration of the “Ground Lease.” A fee simple subject to a condition subsequent merely “provides that upon the occurrence of a stated event the conveyor or his successor in interest shall have the power to terminate the estate so created.” Restatement of Property § 45 (1936) (emphasis supplied). Accordingly, plaintiff must be claiming that the “Deed” document created a fee simple determinable estate.
A fee simple determinable estate “is created by any limitation which, in an otherwise effective conveyance of land, (a) creates an estate in fee simple; and (b) provides that the estate shall automatically expire upon the occurrence of a stated event.” Restatement of Property § 44 (1936). “The ‘stated event’ ... can be either the happening, or the non-happening, of a specified occurrence, and can be either certain, or not certain to happen.” Id. at comment e. For example, a fee simple determinable estate
may be created so as to be defeasible upon the occurrence of an event which is certain to occur some time, if the event is of such a character that the time of the occurrence thereof is neither fixed nor computable nor certain to happen within the duration or at the end of any designated life or lives.
[Id. at comment I (emphasis supplied).]
In other words, if a condition is certain to occur at some time in the future, but the specific time for that occurrence is “neither fixed nor computable,” the condition will result in a fee simple determinable and not an estate for years. See, e.g., Restatement of Property § 44 comment I, illustration 11 (1936) (“A owning Blackacre in fee simple absolute transfers Blackacre ‘to B and his heirs until St. Paul’s Cathedral no longer stands.’ B has an estate in fee simple determinable.”). Here, as noted above, the event resulting in the automatic reversion of the building to Genesis Point Pleasant is the expiration or termination of the “Ground Lease” at the end of, or, for stated reasons earlier than, thirty-five *623 years. The fact that this fixed, computable period of time is specified, makes the interest conveyed, according to the language of the document, an estate for years and not a fee simple.
The mere fact that the agreement between the parties was labelled “Deed,” is not controlling. Cf. Thiokol Chem. Corp. v. Morris County Bd. of Taxation, 41 N.J. 405, 416, 197 A.2d 176 (1964) (observing that the presence or absence of certain words is not an absolute requirement for concluding that an agreement is a lease). The fact that the document was recorded by the Ocean County Clerk’s office does not make it a deed. Long-term leases are often recorded by tenants seeking to place others, such as potential purchasers of the property, on notice of the tenancy. See N.J.S.A. 46:16-1(a) (indicating that leases for a term greater than two years can be recorded in New Jersey).
Given the wording of the document labeled “Deed” and given the contention by each party that there is no material issue of fact in this case, a contention with which I agree, I conclude as a matter of law that plaintiffs interest in the Building is as the tenant and not as the owner.
The conclusion that the “Deed” document is a thirty-five year lease of the building is buttressed by a review of the “Ground Lease” document referred to in the “Deed” document and executed by Claremont Health Systems and Genesis Point Pleasant on the same date as the “Deed” document. In several places in the “Ground Lease” document, the language gives Genesis Point Pleasant certain control over the use of the building, just as any landlord might control the use of a building in a lease.
In Section 1.01 of the “Ground Lease” document, the parties indicate that “[t]he demised premises and the building are sometimes ... collectively called the ‘Property’ ” in the “Ground Lease” document. Section 5.02 of the lease document then provides that, unless Claremont Health Systems obtains the prior written consent of Genesis Point Pleasant, Claremont Health Systems “shall not use or occupy the Property or permit the Property to be used or occupied except for a skilled care nursing home.” (emphasis supplied). Similarly, section 7.01 of the lease states that Clare *624 mont Health Systems, at its own expense, may make any reasonable alterations of and additions to “the Property or any part thereof,” provided that such alterations or additions “shall not change the general character of the Property, or reduce the fair market value thereof below its value immediately before such alteration or addition . . . .” (emphasis supplied). Moreover, section 6.01 of the lease says that Claremont Health Systems, the alleged “owner” of the building, must “keep the entire Property [which is defined in the lease as including the braiding] ... in good and clean order and condition ... and ... promptly make all necessary or appropriate repairs, replacements and renewals thereof, whether interior or exterior, structural or non-structural . . . .” (emphasis supplied).
Elsewhere, Article XXX of the lease document details the environmental covenants agreed to by Claremont Health Systems and Genesis Point Pleasant. Section 30.05 states that, for the purposes of Article XXX, “the Demised Premises shall include ... all improvements . . . .” All of these provisions indicate that there was not a transfer fee simple ownership of the Building from Genesis Point Pleasant to Claremont Health Systems, but that Genesis Point Pleasant retained effective control over the use and nature of the building.
Statutes granting exemption from taxation represent a departure from the equitable principle that all property should bear its just and equal share of the public burden of taxation. Princeton University Press v. Princeton, 35 N.J. 209, 214, 172 A.2d 420 (1961). Such exceptions to the general rule of taxation are to be strictly construed against the exemption claimant.
Exemption is denied on the basis that plaintiff does not own the property for which it claims an exemption.
IV
In view of my determination that plaintiff does not own the building, and is therefore not entitled to the exemption it seeks under N.J.S.A. 54A-3.6, it is not necessary to determine if plaintiff *625 could qualify for the exemption as the owner of only the building and not the land designated as Block 256, Lot 15 on the tax map of defendant Borough. Similarly, since plaintiffs property does not qualify for exemption for the reason that plaintiff does not own the building, but has been found to be a tenant, it is not necessary to determine if plaintiff is a corporation “organized exclusively for hospital purposes” under N.J.S.A. 54:4-3.6. I need not decide these issues at the present time. The only issue before me necessary for disposition of plaintiffs claim is the ownership of the building. Cf. Union City Assocs. v. City of Union City, 115 N.J. 17, 25 n. 4, 556 A.2d 769 (1989) (stating that the Court did not have to decide anything other than the specific issue before it).
The finding that plaintiff does not own the building for which it seeks an exemption disposes of plaintiffs claim for an exemption and also renders moot the constitutional challenge to the “hospital purposes” exemption of N.J.S.A. 54:4-3.6 by the municipality.[4] The case having been decided on non-constitutional grounds, I need not adjudicate the constitutionality of the exemption which is the subject of this litigation. “[Cjourts should not reach constitutional questions unless necessary to the disposition of the litigation.” O’Keefe v. Passaic Valley Water Com’n., 132 N.J. 234, 240, 624 A.2d 578 (1993), (citations omitted).
The parties have agreed that there is no dispute as to the quantum of the assessment in this matter. Plaintiffs motion for summary judgment is denied; defendant’s motion for summary judgment is granted; and the complaint is dismissed. Judgment will be entered accordingly.

 It is not clear from the record whether the negotiations by Hoosier Care were with the parent company. Genesis Health, or with the subsidiary, Genesis Point Pleasant. For purposes of this case, it makes no difference.

 Once again, it is not clear whether the subsidiary or the parent is meant because the Offering Statement refers to both corporations at different times; and, once again, for purposes of this case it makes no difference.

 The Restatement (Second) of Property only supersedes a part of the Restatement of Property. The citations to. the latter in this opinion have not been superseded. In addition, the Restatement (Second) of Property deals with the subject of landlord and tenant not addressed in the Restatement of Property. This is explained in the Restatement of Property Appendix, Introduction (1993).

 In Mega Care, Inc. v. Union Tp., 15 N.J.Tax 566, 571 n. 1 (Tax 1996), the amendment was referred to, but that case dealt with years prior to 1994 and the issue of the constitutionality of the amendment was not before the court.