57 A.3d 25

RAYMOND TARABOKIA, JR. AND ADRIENNE TARABOKIA,
PLAINTIFFS–APPELLANTS, v. STRUCTURE TONE,
DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 9, 2012—Decided November 16, 2012.

Before Judges PARRILLO, SABATINO and MAVEN.

*Dennis S. Brotman* argued the cause for appellants (*Fox Rothschild*, attorneys; *Mr. Brotman*, of counsel and on the brief).

*James P. Lisovicz* argued the cause for respondent (*Coughlin Duffy*, attorneys; *Mr. Lisovicz*, of counsel and on the brief; *Timothy P. Smith*, on the brief; *Brooks H. Leonard*, on the brief).

The opinion of the court was delivered by

PARRILLO, P.J.A.D.

This matter arises from a repetitive motion injury allegedly sustained by a worker at an office building construction site. The injured worker, plaintiff Raymond Tarabokia, Jr., was employed

as an electrician by an independent electrical subcontractor hired by the project's general contractor, defendant Structure Tone, to install wiring for lighting fixtures. Plaintiff suffered permanent injuries in both arms by repeatedly using a specialized power tool over the course of several weeks on the work site. He sued defendant in negligence [1] and his complaint was dismissed on defendant's motion for summary judgment, from which plaintiff now appeals.

■ The issue is whether, under the circumstances presented, the general or prime contractor has a duty to assure the safety of an employee of a subcontractor, and, more specifically, whether the scope of that duty encompasses the manner and means of using equipment supplied by the subcontractor at the contractor's work site. Because the material facts are not genuinely in dispute, *Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995), and the scope of the duty of care is a question of law for the court to decide, *City Check Cashing, Inc. v. Mfrs. Hanover Trust Co.*, 166 *N.J.* 49, 59, 764 *A.*2d 411 (2001), the matter is ripe for summary judgment, *Rule* 4:46–2(c); *Prudential Prop. & Cas. Ins. Co. v. Boylan*, 307 *N.J.Super.* 162, 167, 704 *A.*2d 597 (App.Div.) *certif. denied*, 154 *N.J.* 608, 713 *A.*2d 499 (1998); *Walker v. Atl. Chrysler Plymouth*, 216 *N.J.Super.* 255, 258, 523 *A.*2d 665 (App.Div.1987).

Our review of the trial court's grant of summary judgment is de novo, employing the same standard used by the trial court. *Prudential Prop. & Cas. Ins. Co., supra*, 307 *N.J.Super.* at 167, 704 *A.*2d 597. We consider whether the undisputed material facts, viewed in the light most favorable to the non-moving party, entitle the moving party to judgment as a matter of law. *Brill, supra*, 142 *N.J.* at 540, 666 *A.*2d 146. We conclude that, based on the undisputed material facts, summary judgment was properly granted.

---

[1] Because the claims of his wife, Adrienne Tarabokia, are derivative of plaintiff's negligence claims, "plaintiff" will refer to Raymond Tarabokia, Jr.

Defendant was the general contractor on a 2008 construction project to fit out the interior of five floors of an office building in Plainsboro owned by Novo Nordisk, Inc. Their relationship was governed by an American Institute of Architects (AIA) standard industry form contract that obligated defendant to perform work for the owner in accordance with contract documents. The contract also provided that it "shall not be construed to create a contractual relationship of any kind ... between any persons or entities other than the [o]wner and [general] [c]ontractor."

In its capacity as general contractor, defendant hired Hatzel & Buehler (H & B), one of the twenty largest electrical contractors in the country, to perform the electrical work at the job site. Although defendant had not entered into a written agreement with the subcontractor, they executed a series of purchase orders.

H & B, in turn, hired plaintiff out of his union hall on January 18, 2008. At the time, he was approximately one year and ten months beyond the completion of his training as a union journeyman. Upon his employment with H & B, plaintiff signed an Employee Safety Training Acknowledgement and Commitment Statement that evidenced his receipt and review of the H & B company safety handbook and his participation in H & B's safety orientation.

H & B assigned plaintiff the task of setting anchors to support light fixtures in a concrete ceiling supported by steel beams. H & B's foremen directed plaintiff where the ceiling anchors were to be installed and selected a DX351 powder-actuated anchoring tool manufactured by Hilti (tool or DX351 tool) for use in the installation. The tool, which uses a gunpowder charge to drive anchors into concrete or steel, is analogous to a gun that recoils when fired as the anchor strikes and penetrates the hard surface.

To reach the ceiling, plaintiff had to use either a ladder, scaffolding, or an extension pole for the tool. At H & B's direction, plaintiff used the extension pole provided by his employer, which allowed him to stand on the ground while firing anchors into the ceiling. When the pole extension is used as it is intended,

the worker's hands remain at chest level, never extending past shoulder height. The use of the pole extension resulted in quicker performance because plaintiff did not have to climb a ladder every time he sought to set a new anchor.

Before plaintiff started work, H & B arranged for a Hilti representative to train plaintiff on the proper and safe operation of the tool at the job site. Plaintiff received a card from Hilti signifying his completion of that training. Additionally, plaintiff attended safety meetings conducted by H & B roughly once a week throughout the duration of his work on the project.

Plaintiff began using the tool at the beginning of March 2008. He performed the task without anti-vibration gloves. He estimates that he fired the tool approximately twenty times per hour, eight hours a day, for about one month. He first experienced slight soreness in his right wrist around April 8, 2008, and after the pain worsened, reported it to his employer on April 10, 2008. He was removed from the job the next day. His left wrist symptoms began later that month. Plaintiff was later diagnosed with multiple level polyneural compression syndromes, which were determined to be caused by his repetitive use of the tool.

Pursuant to its contract with Novo Nordisk, defendant was obligated to "designate a responsible member of [its] organization at the site whose duty shall be the prevention of accidents[,]" and to "initiat[e], maintain[ ] and supervise[ ] all safety precautions and programs in connection with the performance of the [c]ontract." Moreover,

If the [c]ontract [d]ocuments give specific instructions concerning construction means, methods, techniques, sequences or procedures, the [c]ontractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures.

In accordance with its contractual obligations to the owner, defendant appointed one of its representatives, Mike Pebley, as the site safety manager (SSM), and prepared a site-specific safety management plan (SSMP) for the project, available for review on site by all subcontractors, including H & B. The stated goal of the

SSMP was "to provide for the systematic identification, evaluation and prevention or control of general workplace hazards, specific job hazards and potential hazards that may arise from foreseeable conditions on the Novo Nordisk project." The SSMP's declared policy was to "[p]rovide a safe working environment" and to "[n]ever accept any unsafe working condition for any reason and to take immediate corrective action when any safety violation is observed."

The SSMP also addressed the responsibilities of the SSM:

> The SSM is the primary contact for health and safety during field activities. Has the authority to stop all work if conditions are judged to be dangerous to on-site personnel or the public, and reports and investigates accidents and near misses.

While the SSMP stated that "[i]t is first the responsibility of the project superintendent to regularly observe job site, work areas, tools, and equipment daily and take all appropriate actions necessary to eliminate or control any hazards that are identified[,]" the plan also emphasized defendant's limited supervisory role over subcontractors:

> This [SSMP] provides assistance in complying with 29 CFR Part 1926 [OSHA] regulations .... The program is in no way a substitute for subcontractor safety programs. *The maintenance of safe operations and the elimination of unsafe practices and conditions remains the responsibility of Structure Tone subcontractors. Structure Tone does not direct, control or supervise the actual performance of subcontractor scopes of work.*
>
> [ (Emphasis added).]

To this end, the SSMP required all subcontractors to, among other things, designate a person with "the responsibility and full authority to enforce the [safety and loss prevention] program[,]" "assum[e] responsibility for complying with all applicable standards, regulations, rules or guidelines" to ensure safety, "establish safety methods and good practices to be carried out by [their] workers[,]" and make at least weekly inspections and report any unsafe practices or conditions. Furthermore, because "[r]ules cannot be written to cover every possible situation that may arise at the ... job site[,]" the SSMP placed certain responsibilities upon the site employees, "namely the protection of themselves and protection of fellow workers."

110

Additionally, all project subcontractors were required to hold their own safety meetings, known as "toolbox talks." H & B held these meetings weekly, which plaintiff attended. H & B was also responsible for appointing a competent person who "has the ability to stop the work, and that person is responsible for their employees, [and is] responsible for the training of their employees while working on site." Moreover, H & B determined the sequencing of its work and the day-to-day activities it conducted, as well as the number of employees it chose to use.

Defendant's project manager, James O'Halpin, was present at the job site for the duration of the project, which was completed free of accidents. He regularly observed the subcontractor work being done during the course of the project and does not recall seeing any H & B employees using the Hilti tool with a pole extension or in a manner non-compliant with regulations promulgated under the Occupational Safety and Health Act, 29 *U.S.C.A.* §§ 651–678 (OSHA). Neither did Pebley, defendant's SSM.

According to O'Halpin, defendant's SSMP "refers to the job in general" and defendant "want[s] to make sure all our subs have their own safety plan for their own specific work." Consequently, H & B had composed its own site-specific manual. And because defendant's employees were not trained in the specific pieces of equipment that each subcontractor used in its portion of the project, defendant had to rely on the proper training and expertise of its subcontractors to use their tools correctly. In fact, none of defendant's representatives ever discussed with H & B employees how they performed their work, much less directed the manner and means of their performance. By the same token, H & B employees never sought advice from defendant as to the conduct of their work.

In support of his negligence claim, plaintiff offered an OSHA expert, Samuel Gualardo, and a biomechanical expert, Andres Calderon. Gualardo cited 29 *C.F.R.* § 1926.16(a), which requires a prime contractor to maintain "overall responsibility for compliance" with OSHA requirements on the job site. Another OSHA

regulation, 29 *C.F.R.* § 1926.302(e), addresses the proper and safe use of powder-actuated tools and states generally that "[p]ersonal protective equipment shall be in accordance with subpart E of this part."[2] In addition, defendant's own SSMP stated that all workers should "have protective gloves appropriate to the task" and required hand protection for all workers "who handle objects or substances that could ... cause unusual or excessive exposure of their hands to harmful physical or chemical agents that are encountered and capable of causing injury or impairments." Gualardo therefore opined that defendant breached its duty to provide plaintiff with a safe working environment and safe job methods by not providing him with any "personal protective equipment to minimize his exposure to vibration caused by the direct fastening tool[,]" or with "an alternative ... safer method for performing his job tasks." Calderon, the other expert, similarly concluded that plaintiff's injury would have been prevented or mitigated if he had been wearing the anti-vibration gloves required for the work he was performing and if he had not been using the fastening tool overhead with the extension poles, "which was a biochemical hazard."

Relying on *Alloway v. Bradlees, Inc.,* 157 *N.J.* 221, 723 *A.*2d 960 (1999), the motion judge reasoned that the foregoing facts required summary judgment in favor of defendant because defendant did not owe a duty to the plaintiff as a matter of law. In denying plaintiff's motion for reconsideration, the judge elaborated:

it's clear to me that no issue of fact exists, [and] that the motion for reconsideration should be denied. [H & B] held regular weekly safety meetings. The pow[d]er [actuated] tools were furnished by [H & B]. Plaintiff was trained in them, was certified in them.

[Defendant] did not participate in the means and method[s] of performing a subcontractor's work. In fact, they wouldn't. That's why you hire subcontractors.. . [T]here's nothing here to indicate that, somehow, there was some blatant

---

[2] Subpart E, 29 *C.F.R.* §§ 1926.95 to 1926.107, does not specifically mention hand protection, or what personal protective equipment (PPE) should be used when operating powder-activated tools.

... misuse of a tool or the manner in which they were doing their work, which would call to the attention of [defendant]....

....

So the control of plaintiff's work really fell to [H & B] ... [and defendant] relied upon H & B and their trained employees to correctly use the tools, and defendant had no knowledge about what constitutes the normal use of the pow[d]er [actuated] tool or that [H & B] would not and did not exercise proper supervision of its job.

On appeal, plaintiff raises the following issues:

I. THE TRIAL COURT'S REQUIREMENT OF PROOF OF ACTUAL NO-TICE BY A GENERAL CONTRACTOR OF DANGEROUS CONSTRUCTION PRACTICES NEGATES DECADES OF DECISIONAL LAW RECOGNIZ-ING A PUBLIC INTEREST IN ENFORCEMENT OF SAFE WORKPLACE PRACTICES

II. BECAUSE DEFENDANT, STRUCTURE TONE[,] KEPT CONTROL OF THE CONSTRUCTION WORKSITE AND ASSIGNED ITSELF ALL SAFE-TY MONITORING AND ENFORCEMENT BY CONTRACTUAL AGREE-MENT, IT IS LIABLE TO PLAINTIFF

    A. The Trial Court Failed to Recognize Binding Precedent

    B. Structure Tone Retained Control of Safety Audits and Enforcement

III. THE ONLY WRITTEN CONTRACT ASSIGNS STRUCTURE TONE CONTROL OF THE WORKSITE AND SAFETY RESPONSIBILITIES

IV. STRUCTURE TONE RETAINED CONTROL OF MEANS AND METH-ODS

V. RAYMOND TARABOKIA IS A THIRD PARTY BENEFICIARY OF THE CONTRACT SIGNED BY STRUCTURE TONE

VI. THE FACTS IN QUESTION MUST BE LEFT TO A JURY

Having reviewed the record de novo, we conclude that summary judgment was properly granted.

    ■   There is no duty of care based solely on a finding that OSHA regulations had been violated. *Alloway, supra*, 157 *N.J.* at 236, 723 *A.*2d 960; *Costa v. Gaccione*, 408 *N.J.Super.* 362, 372–73, 975 *A.*2d 451 (App.Div.2009); *Slack v. Whalen*, 327 *N.J.Super.* 186, 195, 742 *A.*2d 1017 (App.Div.), *certif. denied*, 163 *N.J.* 398, 749 *A.*2d 371 (2000). Rather, a general contractor's duty of care is determined under "general negligence principles." *Alloway, su-pra*, 157 *N.J.* at 230, 723 *A.*2d 960 (internal quotation marks omitted). OSHA violations are only a factor in that analysis.

    At common law, a general contractor enjoyed broad immunity from liability for injuries to an employee of a subcontractor

resulting from either the condition of the premises or the manner in which the hired work was performed. *Muhammad v. N.J. Transit,* 176 *N.J.* 185, 198–99, 821 *A.*2d 1148 (2003); *Majestic Realty Assocs., Inc. v. Toti Contracting Co.,* 30 *N.J.* 425, 430–31, 153 *A.*2d 321 (1959); *Wolczak v. Nat'l Elec. Products Corp.,* 66 *N.J.Super.* 64, 71, 168 *A.*2d 412 (App.Div.1961). The premise underlying that approach is that a general contractor "may assume that the independent contractor and her employees are sufficiently skilled to recognize the dangers associated with their task and adjust their methods accordingly to ensure their own safety." *Accardi v. Enviro–Pak Sys. Co.,* 317 *N.J.Super.* 457, 463, 722 *A.*2d 578 (App.Div.), *certif. denied,* 158 *N.J.* 685, 731 *A.*2d 45 (1999); *see also Muhammad, supra,* 176 *N.J.* at 199, 821 *A.*2d 1148.

While the general contractor's immunity, " '[is not] disturbed by the exercise of merely such general superintendence as is necessary to insure that the subcontractor performs his agreement[,]' " *Muhammad, supra,* 176 *N.J.* at 199, 821 *A.*2d 1148 (quoting *Wolczak, supra,* 66 *N.J.Super.* at 71, 168 *A.*2d 412), certain exceptions to the general principle have come to be accepted. Thus, a general contractor may be liable for a subcontractor's negligence where he retains control of the manner and means of doing the work contracted for. *Muhammad, supra,* 176 *N.J.* at 198, 821 *A.*2d 1148. A general contractor may also be liable where he knowingly engages an incompetent subcontractor or where the work contracted for constitutes a nuisance per se, namely, is inherently dangerous. *Majestic Realty Assocs., Inc., supra,* 30 *N.J.* at 431, 153 *A.*2d 321.

The fact that none of these exceptions are implicated in the summary judgment proofs in this case does not end our inquiry, however. The more modern approach to the traditional common law rule is for courts to identify, weigh and balance a combination of factors in determining the existence of a general contractor's duty of reasonable care, *Alloway, supra,* 157 *N.J.* at 230, 723 *A.*2d 960, a major consideration being the foreseeability of

the risk of injury, both its nature and severity, *id.* at 230–31, 723 *A.*2d 960; *Carey v. Lovett,* 132 *N.J.* 44, 57, 622 *A.*2d 1279 (1993); *Weinberg v. Dinger,* 106 *N.J.* 469, 485, 524 *A.*2d 366 (1987). Foreseeability is generally measured by the general contractor's actual knowledge of dangerous conditions. *See Alloway, supra,* 157 *N.J.* at 231–32, 723 *A.*2d 960. Additional considerations in determining the existence of such a duty include " 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution.' " *Id.* at 230, 723 *A.*2d 960 (quoting *Hopkins v. Fox & Lazo Realtors,* 132 *N.J.* 426, 439, 625 *A.*2d 1110 (1993)). In the end, "[t]he analysis leading to the imposition of a duty of reasonable care ... must satisfy 'an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy.' " *Ibid.*

*Alloway* involved a truck driver employed by an excavating subcontractor that had agreed to deliver crushed stone to a paving (general) contractor for a construction project. *Alloway, supra,* 157 *N.J.* at 225, 723 *A.*2d 960. There was no written contract between the general contractor and the subcontractor, and the subcontractor paid its own drivers, bought its own insurance, and maintained its own vehicles. *Id.* at 226, 723 *A.*2d 960. The driver was injured while attempting to unload the stone at the work site because of a defective mechanical component of the dump truck. *Id.* at 225, 723 *A.*2d 960. The driver had previously experienced problems with the lifting mechanism of the truck and the day before the accident brought this to the attention of her supervisor, who was also an employee of the general contractor. *Id.* at 226–27, 723 *A.*2d 960. The driver then drove the truck to the general contractor's garage, where the general contractor's superintendent and another employee attempted to correct the problem. *Id.* at 227, 723 *A.*2d 960. The driver then drove the truck to another construction site, followed by the superintendent, and the lifting mechanism again failed, prompting the superintendent to use a piece of steel to manually move a lever to make it work, before telling the driver that a cable line needed to be fixed. *Ibid.* This

was never done, and the next day the driver tried to manually engage the mechanism just as the superintendent had done the day before, except she used her arm, resulting in serious injuries. *Id.* at 227–28, 723 *A*.2d 960.

In finding that the general contractor had a duty to ensure the driver's safety, the Court considered the following combination of factors: "the foreseeability of harm, the relationship between the parties, and the opportunity and capacity to take corrective action." *Id.* at 233, 723 *A*.2d 960. As to the foremost consideration, *id.* at 230, 723 *A*.2d 960, the Court found the risk of injury was "clearly foreseeable," inasmuch as there was "actual knowledge" on the part of at least three of the general contractor's employees, including two supervisors, that the truck was defective. *Id.* at 232, 723 *A*.2d 960. "Under the circumstances, it was reasonably foreseeable that this defective component presented a danger to a person who would attempt to correct the defect by manually engaging the mechanism." *Ibid.*

The Court also found that there was "a substantial and close relationship between the parties that could and did implicate workplace safety concerns." *Ibid.* Notably, the principal of the subcontractor was also one of the general contractor's employees, and any breakdown of delivery equipment would delay the paving contractor's work. *Id.* at 233, 723 *A*.2d 960. Thus, there "was a clear connection between [the driver's] performance on behalf of [the subcontractor] and [the general contractor's] own contractual interests." *Id.* at 233, 723 *A*.2d 960.

Moreover, this relationship gave the general contractor "both the opportunity and capacity . . . to exercise authority and control over the equipment of [the subcontractor] if safety concerns were implicated." *Ibid.* Indeed, the general contractor's president acknowledged that his supervisors could dismiss the subcontractor's trucks from the site if they had any problems, including concerns they could not be operated without danger to any employees in the area. *Ibid.* Control was further reflected by the general contrac-

tor's attempt to repair the very truck that caused the injury the day before the accident. *Ibid.*

Accordingly, "as a matter of fairness and sound policy[,]" the combination of the foreseeability of harm, the relationship between the parties, and the opportunity and capacity to take corrective action supported the imposition of a duty of reasonable care on the general contractor to assure the safety of the driver on the work site. *Id.* at 233, 723 A.2d 960.

Weighing these same considerations, the Court in *Carvalho v. Toll Brothers and Developers,* 143 *N.J.* 565, 675 A.2d 209 (1996), found that a project engineer, who was required to provide an on-site inspector to supervise the materials used and the rate at which the work was performed, owed a duty of care to a laborer employed by one of the subcontractors, who was killed when a trench in which he was working collapsed. *Id.* at 571–72, 578, 675 A.2d 209. A critical factor was the foreseeability of the risk of harm. On this score, the Court found that the danger of collapse posed by the deep trenches was apparent given that the project engineer's contract with the township provided for the possibility of unstable trench conditions and prescribed contractual duties addressed to these concerns. *Id.* at 570, 675 A.2d 209. Moreover, other trenches on the construction site had previously collapsed. *Id.* at 574, 675 A.2d 209. Indeed, the engineer's inspector visited the site every day, monitored the trench that collapsed and killed the worker, and was actually present at the scene of the fatal occurrence. *Id.* at 576, 675 A.2d 209. Thus, the project engineer's actual awareness of the risk of harm was "significant in determining the fairness in imposing a duty of care." *Ibid.*

In addition to the foreseeability factor, the relationship of the parties in *Carvalho* was contractual, *id.* at 574, 675 A.2d 209, and contemplated the "active participation and involvement by the engineer in the construction work at the site." *Ibid.* In this regard, "[t]he engineer's supervisory responsibility necessarily entailed the observation of existing conditions and the actual performance of the work undertaken by the workers at the site[,]"

*ibid.,* and thus directly implicated safety concerns, *id.* at 575, 675 *A.*2d 209. Under these circumstances, the Court found that the project engineer had a duty of care to the decedent. *Id.* at 578, 675 *A.*2d 209.

Applying these principles to the facts of this case, we conclude that summary judgment was properly granted. Unlike *Alloway,* the general contractor here had no special or direct contractual relationship with the subcontractor and had not helped to create the dangerous condition. By contrast, in *Alloway,* the contractor had unsuccessfully tried to fix the truck that caused the plaintiff's injury and failed to warn her of the danger it posed and of which the contractor was well aware. *Alloway, supra,* 157 *N.J.* at 227, 723 *A.*2d 960. And in *Carvalho,* it was deemed sufficient for the imposition of a duty of care that the defendant was aware of the general risk of trench walls collapsing, and knew that other trenches had collapsed at the same project site, even though it may not have known that the particular trench that collapsed and killed the plaintiff was unstable. *Carvalho, supra,* 143 *N.J.* at 573–74, 675 *A.*2d 209.

This case presents a very different factual scenario. As noted, defendant had no formal contractual relationship with the subcontractor for whom plaintiff worked. Rather, their arrangement was governed by a series of work orders that did not address worker safety concerns. While the SSMP did address such concerns, it expressly placed on subcontractors the responsibility for ensuring the safety of their own workers.

As to the foreseeability of the risk of harm, there is no proof that defendant knew plaintiff was using the DX351 tool, much less handling it improperly and over a prolonged period of time. Nor had defendant any reason to know of the possible medical consequences of such use, namely that it may result in a repetitive motion injury. Unlike *Alloway* and *Carvalho,* where the dangerousness of the condition, although not inherent in the work performed, was nonetheless immediate and clearly visible, here the actual risk of harm concerned a latent injury not readily

apparent that developed gradually from the repeated use of the tool over an extended time period. Plaintiff emphasizes that defendant performed daily safety inspections of the work site, but the risk here was not immediately obvious and did not involve an unsafe or hazardous physical condition on the premises. Nor did defendant affirmatively contribute to create the harm complained of, as did the general contractor in *Alloway*. Under these circumstances, then, we conclude the risk of harm was neither reasonably nor objectively foreseeable.

As defense counsel acknowledged at oral argument before us, while actual knowledge of the risk of harm may be dispositive for the imposition of a duty of care, *Carvalho, supra,* 143 *N.J.* at 576–77, 675 *A.2d* 209, something less in the way of constructive notice may also suffice. In this regard, the extent of a general contractor's supervision and involvement in the subcontractor's work may be such to allow the inference that the general contractor should have been aware of the risk of harm, and consequently, as a matter of fairness and policy, owed a duty of care to the subcontractor's employees to protect against that risk. The evidence here, however, presents no occasion to draw that inference.

Indisputably, H & B dictated the work plaintiff was to perform at the job site and the tool to use. H & B not only supplied plaintiff with that tool, but also arranged his training on it and directed him to use it with an extension pole instead of a ladder or other elevating device. Defendant, on the other hand, had no control over the choice of equipment selected by H & B, nor did defendant involve itself in the means or methods by which H & B's employees, including plaintiff, performed their work. To the contrary, control over plaintiff's work fell squarely within H & B's expertise, experience and knowledge as a highly reputable electrical subcontractor, qualities that defendant could reasonably rely upon in assuring H & B's workers' safety on site. *See Slack v. Whalen, supra,* 327 *N.J.Super.* at 194, 742 *A.2d* 1017. Indeed, plaintiff has proffered no evidence that defendant knew of the risk of harm created by using the tool with an extension pole and

without protective gloves, and thus defendant may have reasonably deferred to the subcontractor's expertise in this particular matter. *See Accardi, supra,* 317 *N.J.Super.* at 463, 722 *A.*2d 578.

To be sure, the contractual arrangement between defendant and the developer assigned to defendant the overall responsibility for enforcing safety rules on the job. To that end, defendant, among other things, issued an SSMP that clarified the allocation of worker safety responsibility and put all on-site subcontractors on notice that the "maintenance of safe operations and the elimination of unsafe practices and conditions remains the responsibility of [defendant's] subcontractors." The SSMP further stated that defendant does not "direct, control or supervise the actual performance" of subcontractor work and that the information in the SSMP is to assist subcontractors in safety compliance. Thus, each subcontractor was required to designate its own safety officer to make weekly inspections and "assum[e] responsibility for complying with all applicable standards, regulations, rules or guidelines." In other words, according to the SSMP, each subcontractor was responsible for its own safety equipment and the safety of its employees.

It is also uncontroverted that H & B well understood its responsibility. As noted, H & B required plaintiff to be trained in the use of the DX351 tool. H & B held weekly safety sessions that plaintiff attended. H & B also issued its own safety manual to all its employees. Under these circumstances, we find no basis in the record to impose a duty of care upon defendant that would essentially require its active involvement in the details of its subcontractors' business.

Plaintiff, nevertheless, contends that OSHA places on the prime contractor a non-delegable duty for OSHA compliance, 29 *C.F.R.* § 1926.16(a), and that because defendant failed to provide protective gloves or ensure the correct use of the extension pole, as required by OSHA regulations, 29 *C.F.R.* § 1926.302(e), it necessarily follows that defendant is liable for the injuries to plaintiff resulting from his use of the DX351 tool. We disagree.

In the first place, we need not decide the applicability of OSHA to resolve this matter because "non-compliance with [OSHA] standards does not alone create a viable cause of action, nor does it necessarily place a tort duty of care on the general contractor." *Costa, supra,* 408 *N.J.Super.* at 372–73, 975 *A.*2d 451. Of course, "violations of OSHA are to be considered with other fairness factors in determining the existence of a duty and the duty's scope." *Ibid.* (internal quotation marks omitted).

We have taken into account this factor, along with all other relevant considerations, in determining the existence of a duty in this matter. We are satisfied that under these circumstances, assuring compliance with OSHA regulations simply does not amount to the kind of control over the subcontractor's work sufficient to implicate any duty on defendant's part to protect H & B's employees. As previously stated, although defendant maintained broad, general superintendence over the overall results to be accomplished by its subcontractors, defendant exerted no control over the means and details of that accomplishment, which required discrete occupational skills beyond the scope of defendant's regular business. Moreover, there is no indication in the record that an OSHA investigation was conducted or that OSHA violation notices were issued to any entity working on the construction project.

None of the other factors deemed controlling for the imposition of a duty of care in *Alloway* and *Carvalho* are existent here. The very nature of the risk of harm involved in this case was incidental to, and arose out of, the highly specialized work of plaintiff's employer. Even though, as the motion judge correctly recognized, plaintiff and defendant shared responsibility for job site safety, defendant's share of that responsibility should not be enlarged to include prevention of the type of unforeseeable harm suffered by plaintiff. The risk of harm here was not sufficiently foreseeable given its latency and defendant's lack of any knowledge about plaintiff's use of the DX351 tool. Additionally, there was no contractual agreement with plaintiff's employer for defen-

dant to provide safety oversight and nothing in their relationship suggested that defendant had the capacity to control plaintiff's work assignment or the tools he employed in its execution. And lastly, defendant's expectation that on-site subcontractors use their occupational expertise and knowledge to monitor and ensure their own workers' safety was objectively reasonable.

Weighing these factors in the context of all the circumstances presented, we find no basis in the summary judgment record for imposing on defendant a duty to ensure plaintiff's safe and proper use of equipment selected and supplied by his employer. Our sense of basic fairness and consideration of public policy does not compel a different result.

We deem all other issues raised by plaintiff to be of insufficient merit to warrant discussion in this opinion. *R.* 2:11–3(e)(1)(E).

Affirmed.