NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2794-13T2

LISA VAN HORN,

     Plaintiff-Appellant,

v.

HARMONY SAND & GRAVEL, INC.,

     Defendant-Respondent.

_____

| APPROVED FOR PUBLICATION |
| :---: |
| September 10, 2015 |
| APPELLATE DIVISION |

Argued April 28, 2015 — Decided September 10, 2015

Before Judges Messano, Hayden and Tassini.

On appeal from Superior Court of New Jersey, Law Division, Warren County, Docket No. L-288-12.

Randi A. Wolf argued the cause for appellant (Spector, Gadon, & Rosen, P.C., attorneys; Mr. Wolf, on the brief).

Scott M. Wilhelm argued the cause for respondent (Winegar, Wilhelm, Glynn & Roemersma, P.C., attorneys; Mr. Wilhelm and Jennifer L. Toth, on the brief).

The opinion of the court was delivered by

HAYDEN, J.A.D.

Plaintiff Lisa Van Horn appeals from a February 10, 2014 Law Division order granting summary judgment to defendant

Harmony Sand & Gravel (Harmony) and dismissing her complaint to eject Harmony from her property. After reviewing the record in light of the applicable law, we affirm the judgment but on different grounds than the trial court. Shim v. Rutgers, 191 N.J. 374, 378 (2007); Isko v. Planning Bd. of Livingston, 51 N.J. 162, 175 (1968) ("[I]f the order of [a trial court] is valid, the fact that it was predicated upon an incorrect basis will not stand in the way of its affirmance.").

The record reveals the following facts. Van Horn owned a forty-five-acre property (hereinafter "the property") in White Township, Warren County. She inherited the property from her father, Earl Richmond Smith.

In 1990, Smith and Harmony signed an agreement (First Agreement), which they called a "Lease Agreement," permitting Harmony "to remove available soil materials and aggregates from the premises . . . during the term of this Agreement." The parties conditioned the First Agreement on Harmony's ability to secure permits necessary to conduct the quarrying operation. The First Agreement further stipulated that once the materials were removed from the property, Harmony had discretion to choose its prices. Harmony agreed to pay a fixed price for each ton of materials it removed, subject to a minimum amount of $25,000 per

year. The agreement also identified several methods by which Smith could verify the amount removed.

The First Agreement permitted Harmony to construct various improvements on the property, in particular, a screening and processing plant. Harmony constructed the improvements and claimed the market value of the equipment was $1,500,000 in 2012. In the First Agreement, Smith conveyed the right to remove materials exclusively to Harmony, stating that "no other person or entity has an option or right to purchase and/or remove minerals from the subject premises, nor [had he] entered into any agreement with any person or entity which would interfere with [Harmony's] ability to perform a quarrying operation on the [Property]."

The parties agreed that the First Agreement could only be amended through a written agreement, and that it extended to "heirs, successors, and assigns." Harmony had a great deal of discretion over the First Agreement's termination. If Harmony chose to terminate its mining operations, it was obligated to make all required payments to Smith and had up to one year to remove any stockpiled materials. Smith had more limited termination rights, as they only became available in the event Harmony defaulted. In that event, Smith had to give notice to Harmony that it was in default, and Harmony had thirty days to

correct the default from the date on which it received notice. Upon termination, Harmony had to remove all equipment and discontinue further operations, but any equipment left on the property became Smith's property. The First Agreement was witnessed and notarized, but it was never recorded.

The First Agreement expired in February 2000. The parties signed a new agreement ("Second Agreement") on March 2, 2000. This agreement contained many of the same terms as the First Agreement. However, the Second Agreement changed the term of the First Agreement from ten years to "an indeterminate period of years and until [Harmony] determines, in its sole discretion, that sufficient aggregate materials cannot be removed in a manner and/or in such amounts as to make it commercially reasonable to continue the removal of soil materials and aggregates from [Smith's] properties." The royalty payment for every ton of certain of the processed materials or gravel removed changed from one dollar to one dollar and twenty-five cents. Additionally, the parties increased Harmony's termination obligations by requiring it to re-slope banks and spread stockpiled soil, and specified that this obligation

survived termination of the agreement. The Second Agreement was not formally witnessed,[1] nor was it notarized or recorded.

Smith died in 2002, and Van Horn inherited the property after protracted litigation. In 2008, Van Horn's attorney sent a letter to Harmony stating that Van Horn was terminating the lease and sent a notice to quit along with the letter. She sent a second letter terminating the lease along with another notice to quit on April 4, 2012.

On July 16, 2012, Van Horn filed a complaint seeking declaratory judgment[2] that "[Harmony] has no further rights in the property" and that "except for [Harmony's] obligations to restore the property as set forth in the Lease, the Lease is of no further force and effect" and that "[Van Horn] is entitled to possession of the property, including possession of all improvements on the Property." After discovery was completed, the parties agreed that no material facts were in dispute and submitted the sole remaining count to the trial court to determine the meaning of the Second Agreement.

---

[1] The record shows that an employee and a relative of Smith were present when he signed it.

[2] In her complaint, Van Horn included a count seeking damages for breach of the lease, but the parties later consented to dismiss this count along with Harmony's counterclaim.

In her summary judgment motion, Van Horn contended, for the first time, that the Second Agreement was a license rather than a lease. Harmony urged the court to reject this argument based on Van Horn's failure to plead this theory in the complaint, claiming that it had defended the case based on the theory that the Second Agreement was a lease. The trial court rejected this argument, finding that Harmony had sufficiently addressed the license theory in its summary judgment papers.

After hearing oral argument, the court issued its order on February 10, 2014, granting summary judgment in favor of Harmony. The court held that the Second Agreement created a lease, because the parties deemed it a lease and it conferred an exclusive right to conduct a mining operation on the property. The court also addressed Van Horn's argument that the Second Agreement violated the statute of frauds, N.J.S.A. 25:1-10 to -13, because it did not contain a definite term as required for leases. See N.J.S.A. 25:1-12(a). The court held that, although the agreement uses the word "indeterminate," the actual term was clear, as the agreement terminated under specific conditions, namely default or the depletion of the gravel to a commercially unreasonable point. This appeal followed.

On appeal, Van Horn urges this court to interpret the Second Agreement as a license revocable at will.[3] Alternatively, she argues that, if the Second Agreement was a lease, it violated the statute of frauds and must run year-to-year terminable on reasonable notice. Harmony argued that the Second Agreement either conveyed a lease, which complied with the statute of frauds, or, alternatively that, if it was a license, it was irrevocable. At oral argument, we asked the parties to submit supplemental briefs on whether the agreement is a profit a prendre (profit).

We begin with our standard of review relevant to summary judgment. Rule 4:46-2(c) directs that summary judgment be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law."  "While 'genuine'

---

[3] We reject Harmony's claim that this argument cannot be considered because Van Horn did not raise the lease theory until she filed the summary judgment motion. The trial court addressed the license issue and observed that Harmony had sufficiently briefed it.  We perceive no prejudice to Harmony here.  While a complainant must state the factual basis for a complaint the complainant "'is not required to spell out the legal theory upon which [the complaint] is based.'"  Teilhaber v. Greene, 320 N.J. Super. 453, 464 (App. Div. 1999) (quoting Farese v. McGarry, 237 N.J. Super. 385, 390 (App. Div. 1989)).

issues of material fact preclude the granting of summary judgment, those that are 'of an insubstantial nature' do not." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 530 (1995) (internal citations omitted). Essentially, the court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill, supra, 142 N.J. at 536).

We review a trial court's decision on summary judgement "de novo, employing the same standard used by the trial court." Tarabokia v. Structure Tone, 429 N.J. Super. 103, 106 (App. Div. 2012) (citing Prudential Prop. & Cas. Ins. Co. v. Boylan, 307 N.J. Super. 162, 167 (App. Div.), certif. denied, 154 N.J. 608 (1998)), certif. denied, 213 N.J. 534 (2013). We give "no deference to the trial judge's conclusions on issues of law." Depolink Court Reporting & Litig. Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013). Thus, we must also "view the evidence in the light most favorable to the non-moving party and analyze whether the moving party was entitled to judgment as a matter of law." Mem'l Props., LLC v. Zurich Am. Ins. Co., 210 N.J. 512, 524 (2012) (citing Brill, supra, 142 N.J. at 523).

A lease is an agreement whereby a landowner, known as the lessor, agrees to turn over exclusive possession of a property to another party, known as the lessee, for some period of time. Thiokol Chem. Corp. v. Morris Cnty. Bd. of Taxation, 41 N.J. 405, 416 (1964). While there are no technical requirements to create a lease, generally parties use language such as "'lease,' 'let,' 'demise,' 'grant,' and the like." Ibid. Thus, during a lease agreement, the lessee's rights of possession and use are greater than the landowner's. See id. at 417.

In New Jersey, if a lease is intended to last longer than three years, it is not enforceable unless it complies with the statute of frauds. N.J.S.A. 25:1-12. The statute requires a writing signed by the party against whom the agreement is sought to be enforced containing a description of the premises, the term, and the identity of the lessee and lessor. N.J.S.A. 25:1-12(a). Alternatively, if there is not a writing, the above elements must be proved by clear and convincing evidence. N.J.S.A. 25:1-12(b).

In contrast to a lease, a license is an agreement that only gives permission to use the land at the owner's discretion. Thiokol, supra, 41 N.J. at 417. A license is usually freely revocable at the owner's pleasure and is limited to the scope of the agreement for which it was granted. Ibid. A license does

not provide protection for the licensee against interference by the licensor. Twp. of Sandyston v. Angerman, 134 N.J. Super. 448, 451 (App. Div. 1975). Additionally, a license terminates at the death of either of the parties. See Moore v. Schultz, 22 N.J. Super. 24, 31 (App. Div. 1952), aff'd o.b., 12 N.J. 329 (1953); 25 Am. Jur. 2d Easements and Licenses § 117 (2004) (hereinafter "25 Am. Jur.").

While a license is generally revocable at will, under certain circumstances it becomes irrevocable. Moore, supra, 22 N.J. Super. at 29; 25 Am. Jur. at § 122. A license becomes irrevocable if the licensee expends substantial sums of money pursuing the privilege while the licensor acquiesces to the expenditures, or if permitting revocation would permit the licensor to practice a fraud on the licensee, such as revoking a license to cut timber after the licensee has already cut the timber and prepared it for removal. Moore, supra, 22 N.J. Super. at 29; see also 25 Am. Jur. at § 122.

Based upon the well-established legal principles above, we find that the Second Agreement was neither a lease nor a license. While the agreement may have been titled a "lease agreement," the name that parties give to an agreement is not determinative. Sandyston, supra, 134 N.J. Super. at 451. Instead, courts must evaluate the agreement itself to determine

its legal effect rather than rely on what the parties choose to call it. <u>Ibid.</u> This agreement did not explicitly state that Harmony had exclusive possession of the property, which is the cornerstone of any lease agreement. <u>Thiokol</u>, 41 <u>N.J.</u> at 416-17. Rather, the agreement permitted Smith to interfere with Harmony's possession of the land so long as he did not interfere with their mining operation. "[A] lease gives exclusive possession of the premises against all the world, including the owner," <u>Thiokol</u>, <u>supra</u>, at 417, and no such grant is present in the agreement.

Similarly, we also find that this agreement is not a license. In the Second Agreement, Smith conveyed rights and privileges to mine the property that could not be revoked by the landowner, absent a default. Such an agreement is not consistent with the revocable character of a license. Additionally, Smith covenanted that the Second Agreement was binding on his heirs. Licenses are generally freely revocable by the licensor, <u>Thiokol</u>, <u>supra</u>, 41 <u>N.J.</u> at 417, and terminate at the death of either party. <u>Moore</u>, <u>supra</u>, 22 <u>N.J. Super.</u> at 31; 25 <u>Am. Jur.</u> at § 117. Not only does the Second Agreement violate both core principles, but the agreement also provided protection to Harmony against interference with its conduct of the mining operation by the landowner for the duration of the

agreement, while a license does not provide such protection. Sandyston, supra, 134 N.J. Super. at 451. Thus, to classify the Second Agreement as a license would be to violate the clear intent of the parties, which is the lodestar in interpreting an agreement. Sachau v. Sachau, 206 N.J. 1, 5 (2011) (citations omitted); Barr v. Barr 418 N.J. Super. 18, 32 (App. Div. 2011); see also Sandyston, supra, 134 N.J. Super. at 451.

In response to our request for supplemental briefs, Harmony argues that the Second Agreement should be construed as a profit or an easement in gross, claiming that the situation was factually analogous to Moore, supra, 22 N.J. Super. at 24. In Moore, we found that an agreement allowing a person to enter on the land of another to put up quarrying equipment and extract sand and gravel was not a license but a profit. Id. at 30. The court observed: "Quarry rights, mining rights, oil rights, and other similar rights relating to the severance of the physical substances of a servient tenement are normally more commonly interests a prendre appurtenant or in gross, or easements in gross." Ibid. (emphasis omitted).

On the other hand, Van Horn argues that the Second Agreement did not create a profit, because profits are interests in real property, which can only be conveyed by an instrument complying with the formalities associated with a deed, including

that the deed be witnessed and recorded. She also points to the lack of language such as "grant," "transfer," or "convey," in the agreement and argues that the less formal Second Agreement, which was not witnessed or notarized like the First Agreement was, could not convey a greater interest in the property than conveyed by the more formal First Agreement.

We are not persuaded by Van Horn's arguments. Initially, Van Horn does not provide any legal support for her contention that, despite the clearly expressed intention of the parties, the lack of formalities prevented the creation of a profit. Indeed, under the statute of frauds, interests in property can be transferred so long as there is a writing providing a sufficient description of the property, the type of the interest transferred, and the identity of the parties to the transaction signed by the party against whom enforcement is sought.[4] N.J.S.A. 25:1-11(a). Moreover, Van Horn seeks to elevate form over substance, which violates the principle that we interpret agreements to determine the intent of the parties, rather than

---

[4] In fact, New Jersey permits even less formalities in the transfer of property, as even oral agreements can result in enforceable land transfer contracts so long as they are proved by clear and convincing evidence. Prant v. Sterling, 332 N.J. Super. 369, 378 (Ch. Div. 1999), aff'd o.b., 332 N.J. Super. 292, 293 (App. Div.), certif. denied, 166 N.J. 606 (2000); N.J.S.A. 25:1-13(b).

focus solely on the language used. Sandyston, supra, 134 N.J. Super. at 451; 25 Am. Jur. at § 117. Consequently, we find no support for Van Horn's contention that the Second Agreement was too informal to convey a profit.

A profit is distinct from both a lease and a license, as it conveys a lesser interest than exclusive possession, but still conveys an interest that is "alienable, assignable, and inheritable," which distinguishes it from the mere personal privilege of a license. Moore, supra, 22 N.J. Super. at 28; see also 25 Am. Jur. at §§ 2, 3. A profit is closely analogous to an easement. Moore, supra, 22 N.J. Super. at 28; Restatement (Third) of Property: Servitudes ("Restatement") § 1.2, comment (a). Generally, an easement conveys a right of access to land, whereas a profit confers a right to remove something of value from the land. Moore, supra, 22 N.J. Super. at 28; Restatement, § 1.2(2); 25 Am. Jur. § 3. Typical forms of profits include permission to take "marl, loam, peat, sand, gravel, coal, and other minerals." Moore, supra, 22 N.J. Super. at 28 (emphasis added). Significantly, the distinctions between profits and easements are "microscopic." Ibid.

An easement "may be modified or terminated by agreement of the parties, pursuant to its terms" or under other circumstances, such as abandonment, prescription, merger, or

estoppel.  Restatement § 7.1; 25 Am. Jur. at § 96.  Only the holder of the easement is able to unilaterally terminate an easement through renunciation.  See Rossi v. Sierchio, 30 N.J. Super. 575, 578 (App. Div. 1954); Restatement § 7.4.  There is no authority for the proposition that the owner of property subject to an easement can simply renounce the easement.

While the Second Agreement was titled a "lease agreement," agreements creating profit relationships are frequently called lease agreements.  1 Thompson on Real Property, Second Thomas Edition, (David A. Thomas, ed. LexisNexis) § 65.03(b). Moreover, we evaluate agreements to determine their intended effects, rather than give determinative effect to the terminology used.  Sandyston, supra, 134 N.J. Super. at 451; 25 Am. Jur. at § 117.  We are convinced that the Second Agreement clearly created a profit relationship.  The Second Agreement never conveyed the right of exclusive possession, merely the right to extract materials from the property.  Additionally, the Second Agreement limited the non-interference obligations of the owner to Harmony's conduct of a mining operation.  Moreover, the entire agreement was made contingent on Harmony's ability to secure permits, and the Second Agreement was terminable on Harmony's cessation of mining operations.  It is evident that the parties intended to convey the right to extract materials

rather than anything more. Thus, we find that the Second Agreement conveyed a profit, which has not yet terminated. Accordingly, we affirm the trial court's order dismissing Van Horn's complaint, albeit on different grounds.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION