**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3223-15T4

SANDRA ROOPCHAND,

    Plaintiff-Appellant,

v.

COMPLETE CARE, n/k/a FASTCARE,
ROBERT J. FALLON, D.C., and
RICHARD J. SCHALLER, M.D.,

    Defendants-Respondents.

_____

Argued May 16, 2017 — Decided August 3, 2017

Before Judges Reisner, Koblitz and Mayer.

On appeal from Superior Court of New Jersey,
Law Division, Union County, Docket No. L-3654-
14.

Edward F. Szep argued the cause for appellant
(Law Offices of Emanuel S. Fish, attorneys;
Mr. Szep and Emmanuel S. Fish, on the briefs).

Joshua L. Weiner argued the cause for
respondents Complete Care and FastCare (Budd
Larner, P.C., attorneys; Mr. Weiner, of
counsel and on the brief).

James P. Nolan and Associates, attorneys for
respondents Robert J. Fallon and Richard J.

Schaller, join in the brief of respondents Complete Care and FastCare.

PER CURIAM

Plaintiff Sandra Roopchand, a medical technician, appeals from the grant of summary judgment to defendants Complete Care (later known as FastCare) and its former owners, Dr. Richard J. Schaller, M.D. and Dr. Robert Fallon, D.C. Plaintiff sued the doctors alleging a pregnancy discrimination claim under the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-12(s). She was terminated, ostensibly for insubordination, after refusing three times to wash windows on the second floor of the clinic. After reviewing the allegations in the light most favorable to plaintiff, we reverse.

Plaintiff worked at the medical office for urgent care, primary care, rehabilitation, and chiropractic care, from January 2013 until her termination in July 2014. At the time plaintiff was hired, Complete Care was owned by doctors Schaller and Fallon, brothers-in-laws, who had formed the business in 1997. The doctors also owned the building that housed Complete Care.

In January 2014, they sold their practice in preparation for retirement. The practice was renamed FastCare, and renovations were undertaken to expand the primary-care practice by converting the second floor, which had previously been used for billing, into

an area for patient care. The new owner also decided to reduce the staff by firing the registered nurses (RNs).

Dr. Schaller and Dr. Fallon retained ownership of the building and remained operations managers for the practice. Although Dr. Fallon noted that an office manager was on site to handle hiring people, Dr. Schaller stated that he and Dr. Fallon remained in charge of staffing, including hiring and firing.

Plaintiff's duties included both patient care and administrative duties. Plaintiff described her duties as including:

> patient care, collecting copays, checking patients in, collecting any balances due, updating demographic information. . . . triaging patients . . . [t]aking their chief complaints, doing vitals, completing any blood work ordered, EKGs ordered, preparing specimens to be sent out to the lab, glucose testing.

Plaintiff also restocked and cleaned the exam rooms. Part of cleaning the exam rooms included cleaning up vomit, feces, or blood from the rooms or the patients' bathroom. Her normal duties did not include cleaning windows. At the time she was hired, plaintiff worked part-time and was paid $13.50 per hour. By July 2014, plaintiff was paid $15 an hour and worked between thirty-six and thirty-nine hours a week. Plaintiff worked a set schedule of twelve-hour shifts on Monday through Wednesday, with Thursdays and Fridays off.

A-3223-15T4

During her employment, plaintiff was never disciplined. Dr. Fallon stated that he did not have issues with plaintiff's job performance prior to the day she was terminated. Dr. Schaller agreed she was a good worker. Through most of her employment, plaintiff worked primarily with Dr. Schaller, although she would occasionally do administrative tasks for Dr. Fallon if he asked, such as "pull[ing] up patient's records" or "checking in patients."

After the RNs were fired, plaintiff was asked to take on additional responsibilities such as "calling in prescriptions, taking care of refills, receiving blood work results, [and] calling patients with results." She was also asked to serve as the medical technician for the second-floor expansion, working for Dr. Henry, the new primary care physician.

We review the following facts, some of which are disputed, in a light most favorable to plaintiff. R. 4:46-2(c). Plaintiff learned she was pregnant in the beginning of July 2014. Plaintiff, who had been diagnosed with hypothyroidism in 2005, knew that the pregnancy was high-risk because of her condition. The pregnancy was confirmed by her doctor, a high-risk specialist.

On Thursday, July 24, 2014, plaintiff told Dr. Schaller she was pregnant. During their first conversation about her pregnancy, plaintiff told Dr. Schaller that she "was spotting and . . . had

to go to the doctor." Dr. Schaller congratulated plaintiff on her pregnancy and permitted her to go to the doctor's appointment.

When she returned to work after the doctor's visit, plaintiff told Dr. Schaller that she had a high-risk pregnancy and had to see her obstetrician weekly. By Monday, July 28, defendants had created a schedule for August 2014 in which plaintiff's hours were reduced to part-time. That week the second-floor expansion opened and plaintiff was assigned to be the medical technician for that floor.

On the morning of Tuesday, July 29, 2014, plaintiff informed Dr. Fallon when she arrived at work that she was pregnant. Dr. Fallon told her that he had already found out that morning, and congratulated her. Plaintiff did not tell Dr. Fallon at the time that her pregnancy was high-risk, but she assumed Dr. Schaller had passed along this information.

That same morning, plaintiff overheard a conversation between Drs. Fallon and Schaller that she initially did not consider important. She heard Dr. Schaller say to Dr. Fallon, "I don't care, she's a liability." She said she did not hear anything else but noted they started "talking lower at that point." She did not know at the time who they were talking about, but later inferred that they were talking about her.

The office was crowded with many patients that day. Because plaintiff was working upstairs in the newly-renovated part of the office, she was required to go up and down between the first and second floor. Dr. Fallon was on the second floor on a stepladder changing ballasts and water-stained ceiling tiles to ready the space for patients. A rehab technician who often worked with Dr. Fallon was cleaning the elevator.

Dr. Fallon stated in his deposition that although FastCare employed a cleaning service who came four nights a week, he had suspended the cleaning crew services to the second-floor because of the ongoing construction.

While plaintiff was busy working with a new patient who needed bloodwork and X-rays, Dr. Fallon came up to her and asked her to wash the windows on the second floor. She told him, "I don't do windows." When asked why she said that, plaintiff responded:

> A. I honestly thought he was playing around. I didn't think he was serious.
>
> Q. Why did you think he was playing around?
>
> A. Because it's not part of my job description, number one. Number two, it's not something that anyone has ever asked me to do before nor have I seen anyone working there do before. So I really thought he was playing. We didn't have any type of disagreement early that morning. You know, we weren't, like, had any tension between each other or anything like that. So, you know, there were times where we did joke and play around. I said

that and I kept moving. I went back downstairs.

Plaintiff also thought Dr. Fallon was "kidding" because he knew she was pregnant and "he knew [she] was high risk and [she] would have to get on a ladder." Plaintiff, who is 5'1", would need a ladder to clean the floor to ceiling windows.[1]

About ten minutes later, Dr. Fallon again asked plaintiff to wash the windows. Dr. Fallon had called the rehab tech over to listen to the conversation. Plaintiff again responded, "I don't wash windows, you know." Dr. Fallon responded, "you will if I order you to." In addition to the rehab tech, four other employees were upstairs and heard the exchange.

Plaintiff then "looked at . . . all of them because they were looking at [her] and [she] said, did ya'll ever clean, did he ever ask ya'll to clean windows and they [were] like no." When she came back upstairs a third time, Dr. Fallon told her "I'm going to ask you one last time, are you going to wash those windows or not." Plaintiff replied no, that she could call somebody to do it for him, but she was not washing the windows. Plaintiff offered to decorate the bathroom, which she stated was already "clean." She was embarrassed by the confrontation in front of her co-workers and believed he was "picking on [her]." Plaintiff never raised

---

[1] Defendants dispute that a ladder would have been required for plaintiff to clean the windows.

her voice nor used inappropriate language in speaking to Dr. Fallon.

Dr. Fallon fired her for insubordination and told her to "get out." Dr. Fallon acknowledged that he did not warn plaintiff that if she did not wash the windows he was going to fire her. After Dr. Fallon fired her, plaintiff went downstairs and spoke with Dr. Schaller, who told her to go home and he would call her later. Plaintiff texted Dr. Schaller the following day; he responded that her termination was final.

Prior to this incident, plaintiff had never before been asked to clean windows, nor was she aware of any other employee who was asked to clean windows. Both parties agree that defendants did not have a written policy as to what constituted insubordination. According to plaintiff, a non-pregnant former employee named Lillian, who frequently argued forcefully with Dr. Fallon, including telling him to "shut up," was not fired for insubordination.

After she was fired, plaintiff successfully appealed the denial of unemployment benefits. Although in no way binding on this court, it is interesting to note that the Appeal Tribunal found after a telephonic hearing: "Had the doctor informed the claimant that her refusal to comply with the directive would result in her termination she would have informed him she was refusing

because of her high risk pregnancy." The Tribunal determined: "No disqualification arises under N.J.S.A. 43:21-5(b) as the claimant was not discharged for misconduct connected with the work."

In his decision, the motion judge stated defendants offered the "legitimate, non-discriminatory reason . . . [of] insubordination" for her termination and plaintiff could offer "no support" that defendants' claim was a "pretext for the termination." The judge found that plaintiff's assumption that one doctor told the other doctor that her pregnancy was high-risk or that she could not wash the windows due to alleged high-risk pregnancy was an assumption without any supporting facts. The judge also mistakenly stated that "there is no evidence whatsoever that Dr. Fallon even knew of [plaintiff's] pregnancy prior to terminating her employment."

The judge also found that although the LAD requires that both the employee and employer participate in a reasonable accommodation process, the plaintiff had never asked for an accommodation, so this issue was moot. The judge stated that although plaintiff alleged that her pregnancy was high-risk due to hypothyroidism, "she did not have any work restriction due to her pregnancy, and at no time told [the defendants] that she had any work restrictions."

Summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and the movant is entitled to a judgment or order as a matter of law." R. 4:46-2(c). Our "review of the trial court's grant of summary judgment is de novo, employing the same standard used by the trial court." Tarabokia v. Structure Tone, 429 N.J. Super. 103, 106 (App. Div. 2012), certif. denied, 213 N.J. 534 (2013). We must "view the facts in the light most favorable to the non-moving party." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374 (2010).

Effective January 17, 2014, the Legislature modified the LAD to incorporate "pregnancy" as a protected characteristic. N.J.S.A. 10:5-12(s); N.J.S.A. 10:5-3.1(b), the Pregnant Workers Fairness Act (PWFA). The Legislature also required employers to make reasonable accommodation to a pregnant employee and noted its intention:

> to combat this form of discrimination by requiring employers to provide reasonable accommodations to pregnant women and those who suffer medical conditions related to pregnancy and childbirth, such as bathroom breaks, breaks for increased water intake, periodic rest, assistance with manual labor, job restructuring or modified work schedules, and temporary transfers to less strenuous or hazardous work.
>
> [N.J.S.A. 10:5-3.1(b) (emphasis added).]

The amendment to the LAD makes it unlawful "[f]or an employer to treat, for employment-related purposes, a woman employee that the employer knows, or should know, is affected by pregnancy in a manner less favorable than the treatment of other persons not affected by pregnancy but similar in their ability or inability to work." N.J.S.A. 10:5-12(s).[2] N.J.S.A. 10:5-12(s) also requires an employer to:

> make available to the employee reasonable accommodation in the workplace . . . for needs related to the pregnancy when the employee, based on the advice of her physician, requests the accommodation, unless the employer can demonstrate that providing the accommodation would be an undue hardship on the business operations of the employer.

When analyzing a claim under the LAD that addresses the employer's intention, "New Jersey has adopted the procedural burden-shifting methodology articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005).

Under this methodology, a plaintiff must first present a prima facie case of discrimination and may use circumstantial

---

[2] Prior to enactment of this law, the LAD was interpreted to prohibit discrimination against pregnant employees as gender discrimination. See Rendine v. Panter, 141 N.J. 292, 298 (1995); Farley v. Ocean Twp. Bd. of Educ., 174 N.J. Super. 449, 452 (App. Div.), certif. denied, 85 N.J. 140 (1980); Gilchrist v. Bd. of Educ., 155 N.J. Super. 358, 368 (App. Div. 1978).

evidence. Ibid. "The evidentiary burden at the prima facie stage is 'rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent--i.e., that discrimination could be a reason for the employer's action.'" Ibid. (quoting Marzano v. Computer Science Corp., 91 F.3d 497, 508 (3d Cir. 1996)). "Once a plaintiff establishes a prima facie case, an 'inference of discrimination' is created." Tisby v. Camden Cnty. Corr. Facility, 448 N.J. Super. 241, 248-49 (App. Div.) (quoting Zive, supra, 182 N.J. at 449), certif. denied, ___ N.J. ___, ___ (2017).

The employer then has the opportunity to challenge the inference of discrimination by articulating a "legitimate, nondiscriminatory reason for the employer's action." Zive, supra, 182 N.J. at 449. "If the employer can meet its burden [of production], the burden again shifts back to the employee to prove the reason provided by the employer is "merely a pretext for discrimination and not the true reason for the employment decision." Tisby, supra, 448 N.J. Super. at 249 (quoting Zive, supra, 182 N.J. at 449).

At the third step, a plaintiff may put forth evidence that the reason offered by the employer was pretextual by "either circumstantial or direct evidence that 'discrimination was more likely than not a motivating or determinative cause of the action'

or plaintiff can discredit the legitimate reason provided by the employer."  Id. at 249 (quoting El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 173 (App. Div. 2005)).  "[T]he burden of proving that the employer intentionally discriminated remains at all times with the employee."  Maryanne Grande v. Saint Clare's Health Sys., ___ N.J. ___, ___ (2017) (slip op. at 19-20).

The elements of the prima facie test vary depending on the nature of the LAD claim.  Victor v. State, 203 N.J. 383, 408 (2010).  In Zive, our Supreme Court set out a general test for termination cases, in which a plaintiff must prove that:

> (1) he [or she] was in the protected group; (2) he [or she] was performing his job at a level that met his [or her] employer's legitimate expectations; (3) he [or she] nevertheless was fired; and (4) the employer sought someone to perform the same work after he [or she] left.
>
> [Zive, supra, 182 N.J. at 450; see also Rendine v. Pantzer, 276 N.J. Super. 398, 434-35 (1994), aff'd, 141 N.J. 292 (1995) (relating the burden-shifting scheme in a LAD termination case for pregnancy discrimination).]

Defendants do not argue that prong four, hiring a replacement, is applicable here.  Prong four has also been articulated as requiring a plaintiff to prove "she was terminated under circumstances that give rise to an inference of unlawful discrimination."  Young v. Hobart W. Grp., 385 N.J. Super. 448, 463 (App. Div. 2005) (citing

Williams v. Pemberton Twp. Pub. Sch., 323 <u>N.J. Super.</u> 490, 733 (App. Div. 1999)).

Viewing her contentions in the light most favorable to her, plaintiff made out a prima facie case for disparate treatment under the PWFA because: 1) she was part of the protected class of pregnant workers and her employers knew of her pregnancy; 2) she was performing her work responsibilities; 3) she suffered the adverse employment action of being demoted to part-time status, ordered to wash windows, and then fired; and 4) she was required to perform an act outside the scope of her job description, that other non-pregnant employees were not required to perform, thus raising an inference of unlawful discrimination.

Plaintiff asserts that defendants' proffered reason for her termination was pretextual: that her refusal to use a ladder to clean windows, when pregnant, does not constitute insubordination.

Plaintiff also argues that she requested a reasonable accommodation due to her high-risk pregnancy. On Thursday, July 24, 2014, she requested the accommodation from Dr. Schaller seeking permission to see her doctor once a week based on her doctor's advice. She maintains she was penalized for the request.

Defendants respond that plaintiff never requested a reasonable accommodation for her pregnancy. They note that plaintiff at no point stated that she had restrictions based on

her pregnancy. Defendants add that even if plaintiff did make a reasonable accommodation request, the request was not based on the advice of her physician, which they claim is required under the PWFA. Regardless of whether plaintiff, in seeking to go to her doctor weekly made a legally sufficient request for an accommodation or not, she did present a prima facie case of pregnancy discrimination.

She submitted sufficient evidence for a reasonable jury to infer that her termination was a pretext for unlawful discrimination. Plaintiff argues that she did ask for a reasonable accommodation from Dr. Schaller based on the advice of her physician; that the work responsibilities of a medical assistant/technician do not include climbing ladders to wash windows; and that Dr. Fallon knew that she required an accommodation in particular because her pregnancy was high-risk.

Viewing plaintiff's claim in its most favorable light, shortly after she informed the doctors that she was pregnant, she heard them whispering that she was a liability. Later, she was the only employee asked to stand on a ladder and wash windows, and was terminated for her refusal to do so, although another, non-pregnant employee who was persistently insubordinate was not fired. Regardless of whether plaintiff's request to visit her doctor weekly is viewed as a doctor-directed pregnancy

accommodation, plaintiff demonstrated sufficient evidence of pregnancy discrimination to survive summary judgment.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION